UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KEENAN T. KNIGHT,

    Plaintiff,

    v.                                  Case No. 23-cv-886

AMIKA AVERY,
JORDAN TAYLOR, and
TERRELL WILLIAMS,

    Defendants.

## DEFENDANTS' PROPOSED FINDINGS OF FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(c)(1)(A) and Civil Local Rule 56(b)(1)(C), Defendants Amika Avery, Jordan Taylor and Terrell Williams submit the following Proposed Findings of Fact in support of their Motion for Summary Judgment.

**A. Knight Had a Reputation of Disruptive and Assaultive Behavior in the Jail.**

**1.** Keenan T. Knight ("Knight") was incarcerated in the Milwaukee County Jail (the "Jail") from December 5, 2021 through October 13, 2023. (Hannah Decl., ¶ 6; Williams Decl., ¶ 5; Taylor Decl., ¶ 6; Dingman Decl., ¶ 4).

**2.** Mr. Knight was known by many because of his rather large build, standing approximately 6'4" and weighing approximately 275 pounds. (Hannah Decl., ¶ 7; LeFlore Decl., ¶ 6; Williams Decl., ¶ 6; Taylor Decl., ¶ 7; Avery Decl., ¶¶ 5-6).

**3.** Prior to May 31, 2023, Knight engaged in numerous physical altercations and created multiple disturbances during his incarceration in the Jail. (Hannah Decl., ¶ 8; LeFlore Decl., ¶ 6; Williams Decl., ¶ 6; Taylor Decl., ¶ 7; Avery Decl., ¶ 6; Dingman Decl., Ex. 6, pp. 33-

76).

4. Indeed, Knight received 9 major disciplinary writeups, which includes instances of being in possession of contraband, including being in possession of a weapon. (Hannah Decl., ¶ 8; Williams Decl., ¶ 6; Dingman Decl., ¶ 10, Ex. 5).

5. Knight routinely disobeyed orders from staff, had issues complying with the rules and expectations of the Jail, and was placed on administrative segregation[1] multiple times due to his unpredictable and disruptive behavior. (Hannah Decl., ¶ 9; Williams Decl., ¶ 6; Avery Decl., ¶ 6; Nikolay Decl., ¶ 4; Ex. 1, Knight Dep. Tr. 21:2-11; Dingman Decl., Ex. 6, pp. 33-76).

6. In fact, Lt. Avery and Officers Williams and Taylor were aware that Knight was in multiple physical altercations and had history of exhibiting unpredictable and disruptive behavior before the May 31, 2023 incident occurred. (Williams Decl., ¶¶ 5-6; Taylor Decl., ¶¶ 6-7; Avery Decl., ¶¶ 5-6).

**B. Because of Knight's Disruptive Behavior on May 31, 2023, Objectively Reasonable Force Was Necessary to Ensure the Safety and Security of the Jail and Those Within It.**

7. Due to the discovery of smoke within Housing Unit 6B, Lt. Avery ordered Officers Williams and Taylor to assist with conducting cell searches to recover contraband from the occupants. (Williams Decl., ¶¶ 8-9; Taylor Decl., ¶ 9; Avery Decl., ¶¶ 8-10).

8. To aide in the search of his cell, Mr. Knight was moved to the 6th Floor non-contact booth area while both Officer Taylor and Officer Williams conducted the search. (Williams Decl., ¶¶ 10, 11; Avery Decl., ¶ 9).

9. Knight initially refused to go into the non-contact booth, but eventually complied

---

[1] Administrative segregation is a classification assigned to occupants who frequently disrupt the orderly operations of the Jail. When on administrative segregation, occupants are monitored more closely to ensure adherence to the Jail's rules. Occupants receive weekly reviews to determine whether their behavior has improved and, if it has, the occupant will be permitted to return to a general population housing unit. (Hannah Decl., ¶ 12).

with Lt. Avery's orders. (Nikolay Decl., ¶ 4, Ex. 1, Dep. Tr. 11:8-14:12, 48:5-49:19).

10. Inside Mr. Knight's cell the officers found a bag of coffee with a clear plastic bag hidden inside containing four Newport cigarettes and two pieces of paper filled with tobacco as well as a razor hidden inside of a brown paper bag, all of which are considered contraband and prohibited inside the Jail. (Williams Decl., ¶ 12; Taylor Decl., ¶ 10; Avery Decl., ¶ 11).

11. After being notified of the contraband, Lt. Avery ordered that Knight be moved to housing unit 4A, pending discipline. (Williams Decl., ¶ 13; Avery Decl., ¶ 13).

12. Around the 1800 hours, Captain Hannah responded to the 6th Floor of the Jail after contraband was found in Knight's cell, photographed the contraband, and ordered that Knight be placed on administrative confinement because of his history of being an institutional behavioral problem. (Hannah Decl., ¶ 11; Avery Decl., ¶¶ 12-13).

13. Lieutenant Avery approached the non-contact booth where Mr. Knight was temporarily housed and explained to him that he would be placed on discipline pending a due process hearing due to being in possession of contraband and asked him if he would comply with the changeover process[2] for occupants being placed on pending discipline. (Avery Decl., ¶ 14; Williams Decl., ¶ 14; Dingman Decl., Ex. 4 at 18:05:08-18:08:45; Taylor Decl., ¶ 12; Nikolay Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 50:5-18).

14. Knight was also informed he would be placed on administrative segregation, to which he responded, "well I ain't complying then - we might as well get this party started" and the cell door in which he was housed is seen visibly moving as if it were kicked by Knight. (Williams Decl., ¶ 14: Dingman Decl., Ex. 4 at 18:09:00-18:09:06).

15. Knight repeatedly demanded to speak with Captain Hannah because he disagreed

---

[2] Occupants being placed on discipline or pending discipline are changed into red jail-issued clothing. (Williams Decl., ¶ 14).

3

with his placement on administrative segregation. (Avery Decl., ¶ 14; Nikolay Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 35:15-36:23, 53:11-17, 54:6-13).

16. Lt. Avery again ordered Knight to comply with the legal and lawful order to be placed in a RIPP restraint belt to be escorted to housing unit 4A; Officers Williams, and Taylor and Deputy Sheriff Raul Rivera arrived and also tried to communicate with Knight to gain compliance, but Knight continued to refuse to comply. (Avery Decl., ¶ 16; Taylor Decl., ¶ 13).

17. Indeed, Deputy Rivera informed Knight that he would open the cell door and ordered Knight to place his hands out of the cell when that happened; however, Knight was unresponsive. (Nikolay Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 51:1-21).

18. Occupants that actively and deliberately resist the orders of corrections staff become a threat to the safety and security of the Jail, the staff, and the occupants. (Hannah Decl., ¶ 4; LeFlore Decl., ¶ 4; Williams Decl., ¶ 4; Taylor Decl., ¶ 4; Avery Decl., ¶ 4).

19. Knight continued to refuse all orders and stated, "If I'm going on ad-seg I might as well make it for a reason," which confirmed noncompliance to Officer Williams, so he unholstered his taser, aimed it at Knight, and informed Knight that if he did not comply with staff orders to be secured, force can and will be used against him to get him to move to his new housing assignment. (Williams Decl., ¶ 17; Taylor Decl., ¶ 16; Dingman Decl., Ex. 3 at 18:10:40-18:12:53, Ex. 4 at 18:11:00-18:11:44).

20. While inside the non-contact booth, Mr. Knight was repeatedly cracking his knuckles and making fists, all of which was indictive to Officer Taylor that Mr. Knight was not going to go without a fight. (Taylor Decl., ¶ 13).

21. Officer Williams further warned Knight that if he did anything besides put his hands outside of the cell to be cuffed, he would be tased, to which Knight stated "you want to blow that

4

mother fu**er, you wanna blow it?" (Williams Decl., ¶ 18; Dingman Ex. 3 at 18:12:53-18:13:44; Nikolay Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 52:7-19).

22. Officers do not enter an occupant's cell to cuff him or her. Rather, occupants are required to place their arms voluntarily outside of their cell so their wrists may be handcuffed to ensure that officers are not assaulted inside of occupants' cells. (Taylor Decl., ¶ 15)

23. At this time, Officer Williams instructed Officer Taylor to begin securing Mr. Knight's hands into the handcuff portion of the RIPP restraint belt. (Williams Decl., ¶ 19; Dingman Decl., Ex. 4 at 18:11:51-18:13:01).

24. A RIPP restraint belt is a Velcro belt that is placed around the midsection of an occupant and secured in the back of the occupant. A D-ring is attached to the Velcro belt. A metal ring then connects the D-ring to the handcuffs which secures the occupant's hands. (LeFlore Decl., ¶ 10; Avery Decl., ¶ 15).

25. At this time, Lt. Avery radioed for additional staff to respond to the 6th Floor – Floor Control due to Mr. Knight's continued resistive behavior, and Officer Deone Dortch was one of the officers who responded. (Williams Decl., ¶ 15; Taylor Decl., ¶ 14; Avery Decl., ¶ 18; Dingman Decl., Ex. 3 at 18:12:17-18:12:53, Ex. 4 at 18:12:17-18:12:53).

26. Officer Dortch also tried to gain compliance from Mr. Knight but was not successful. (Avery Decl., ¶ 18; Nikolay Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 66:24-67:1).

27. Officers Dortch and Taylor were able to guide Mr. Knight out of the non-contact booth while Officer Taylor was attempting to secure one of his hands in the handcuff portion of the RIPP restraint belt. (Taylor Decl., ¶ 17; Avery Decl., ¶ 19).

28. During this process, Mr. Knight was agitated, tense, and focused on Officer Williams, whose taser remained drawn and aimed at Mr. Knight. (Taylor Decl., ¶ 17; Nikolay

5

Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 56:25-57:23).

29. Officer Taylor secured one of Knight's wrists into the handcuff portion of the RIPP restraint belt; however, Officer Dortch was not successful in securing his other wrist into the handcuff due to Knight clasping his hands together to prevent his other wrist from being secured. (Williams Decl., ¶ 20; Dingman Decl., Ex. 4 at 18:13:07-18:13:48; Nikolay Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 56:25-57:23).

30. Officer Taylor then attempted to secure Mr. Knight's other hand in the handcuff portion of the RIPP restraint belt but was unable due to him tensing up and moving. (Taylor Decl., ¶ 18; Nikolay Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 63:15-64:24).

31. Officer Williams holstered his taser and positioned himself behind Knight and began to place the RIPP restraint Velcro belt around Knight's waist; however, Knight continued to resist, preventing Officer Williams from being able to secure Knight. (Williams Decl., ¶ 21; Taylor Decl., ¶ 18; Avery Decl., ¶ 20; Dingman Decl., Ex. 3 at 18:13:42-18:13:50, Ex. 4 at 18:13:42-18:13:50).

32. An occupant who is not fully secured in a RIPP restraint belt can pose significant security concerns, particularly an occupant with the size and stature of Knight. (Hannah Decl., ¶ 18; LeFlore Decl., ¶ 11; Williams Decl., ¶ 16; Avery Decl., ¶ 17).

33. In mere seconds, Mr. Knight would be able to use the belt portion of the restraint device as a weapon to hit or choke officers and/or other occupants. (Hannah Decl., ¶ 18; LeFlore Decl., ¶ 11; Williams Decl., ¶ 16; Avery Decl., ¶ 17; Nikolay Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 79:24-80:8).

34. At this time, Lt. Avery and Officer Taylor observed Knight tense up and ball his fist up, which signified to Officer Taylor that Knight was getting into a pre-attack posture and an

6

attempted assault was imminent. (Taylor Decl., ¶ 18; Avery Decl., ¶ 20).

35. After assessing the dangerousness of the situation, and Knight's continued level of resistance and the fact that it felt to Officer Williams as if Knight was pulling his hands away, Officer Williams performed a secure head decentralization technique[3] on Knight to gain his compliance and to prevent injury to staff. (Williams Decl., ¶ 22; Taylor Decl., ¶ 18; Avery Decl., ¶ 20; Dingman Decl., Ex. 4 at 18:13:51-18:13:55; Nikolay Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 73:11-14, 74:23-75:22).

36. Once on the ground, several officers, including Lt. Avery and Officer Taylor, rushed over to Knight to further stabilize him as he was on the ground resisting and had ahold of Officer Williams' shirt collar. (Avery Decl., ¶ 22; Williams Decl., ¶ 23; Taylor Decl., ¶ 19; Dingman Decl., Ex. 4 at 18:13:56 -18:14:01; Nikolay Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 77:14-21, 81:6-10).

37. Knight was given several commands by Officers Williams and Taylor to let him go, but Knight did not comply with those commands. (Williams Decl., ¶ 23; Avery Decl., ¶¶ 22-23; Taylor Decl., ¶ 19; Dingman Decl., Ex. 3 at 18:14:10-18:14:14).

38. Fearing for the safety of Officer Williams and to stop Knight from further resisting, Lt. Avery attempted to apply a pressure point to Knight's right ear to force him to release Officer Williams' shirt collar, but it was not successful. (Avery Decl., ¶ 24).

39. Lt. Avery next delivered two strong side arm focus strikes to Knight's abdomen, which were unsuccessful. (Taylor Decl., ¶ 19; Avery Decl., ¶ 24).

---

[3] A secure head decentralization technique is where an officer blankets and secures the occupant's head with proper hand position with the reaction hand cupping the front of the occupant's chin and with the strong side hand positioned over the occupant's eyes and nose. The officer moves slightly backwards from the occupant to move the occupant off center, gives proper verbal commands, and pivots along an arc and properly directs the occupant to the ground. (Williams Decl., ¶ 22; Avery Decl., ¶ 21).

7

40. Both the pressure point and focused strikes are trained techniques used before escalating the use of force. (Avery Decl., ¶ 24).

41. Assessing the dangerousness of the situation, including the fact that Knight had a RIPP restraint belt that was not secured on his person which he could use as a dangerous weapon, and Knight's continued level of resistance, at approximately 1814 hours Officer Taylor unholstered his taser and warned staff of his intent to use it by stating "Move, Taser, Taser, Taser" as is proper procedure. (Taylor Decl., ¶ 20; Williams Decl., ¶ 24; Avery Decl., ¶ 25; Dingman Decl., Ex. 3 at 18:14:15-18:14:22; Nikolay Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 79:24-80:18, 81:6-10).

42. Officer Taylor then deployed his taser, striking Knight in the buttocks and lower back. (Taylor Decl., ¶ 20; Avery Decl., ¶ 26; Dingman Decl., Ex. 3 at 18:14:15-18:14:22).

43. The taser was effective resulting in Knight's immediate compliance and Officer Williams was able to escape from Knight's grip. (Taylor Decl., ¶ 20; Avery Decl., ¶ 26; Dingman Decl., Ex. 4 at 18:14:00-18:14:17).

44. Officer Taylor was then able to properly secure Knight, thereby diminishing the active threat he posed. (Taylor Decl., ¶ 20; Nikolay Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 90:21-91:2).

45. It must be noted that Knight was not fully secured in his RIPP restraint belt until after he was tased. (Williams Decl., ¶ 25, Ex. 3 at 18:14:30-18:14:37; Nikolay Decl., ¶ 4, Ex. 1, Knight Dep. Tr. 90:21-91:2).

46. Additional staff arrived, including medical, to remove Knight's taser prongs. (Williams Decl., ¶ 26; Taylor Decl., ¶ 21; Avery Decl., ¶ 27; Dingman Decl., Ex. 3 at 18:16:56-18:19:32, Ex. 4 at 18:16:56-18:19:32).

47. Knight continued to act in a resistive manner after being tased. (Hannah Decl., ¶¶

13-15, 19-21; LeFlore Decl., ¶¶ 13-14, Ex. 3 at 18:19:29-18:19:52, Ex. 4 at 18:19:29-18:20:15).

48. However, at approximately 1823 hours, Knight complied with staff and was escorted by Officers Dortch, Taylor and LeFlore to Pod 4A, pending discipline, without further incident. (Taylor Decl., ¶ 21, LeFlore Decl., ¶ 15; Hannah Decl., ¶ 22; Avery Decl., ¶ 28; Dingman Decl., Ex. 3 at 18:23:51-18:26:01, Ex. 4 at 18:23:51-18:24.02).

49. The corrections staff present did not observe any officer use excessive force during the incident involving Mr. Knight on May 31, 2023. (Williams Decl., ¶ 27; Taylor Decl., ¶ 22; Avery Decl., ¶ 29).

### C. Knight's Injury was Di Minimus.

50. After Knight was tased, medical staff removed the prongs from his left buttocks and left flank area without difficulty. (Nikolay Decl., ¶ 5, Ex. 2).

51. The areas on Knight's body that were hit by the taser prongs were cleaned with normal saline and he denied any other concerns. (Nikolay Decl., ¶ 5, Ex. 2).

52. Later in the evening on May 31, 2023, Knight was seen by medical staff for complaints of left flank pain from being tased. (Nikolay Decl., ¶ 5, Ex. 2).

53. Medical staff noted that Knight's "[w]ounds do not appear reddened and are not draining." (Nikolay Decl., ¶ 5, Ex. 2).

### D. Knight Failed to Comply with the Statutory Requirements to Bring State Law Claims.

54. Pursuant to Wisconsin Statute section 893.80(1d), the Milwaukee County Clerk's Office must be presented with a claim containing the address of the claimant and an itemized statement of the relief sought when said matters are alleged against Milwaukee County and/or its employees. (Dostanic Decl., ¶ 4).

55. If service of a written claim pursuant to Wisconsin Statute section 893.80(1d) is

9

made on the Milwaukee County Clerk, the claim would be loaded by an employee of the Milwaukee County Clerk's Office into the OnBase notification system. (Dostanic Decl., ¶ 5).

56. A search of the County's OnBase system revealed no claims pertaining to Keenan Knight from May 31, 2023 to the present, which means Mr. Knight did not serve any such claim on the Milwaukee County Clerk. (Dostanic Decl., ¶¶ 6-7).

Dated at Milwaukee, Wisconsin this 1st day of August, 2024.

                                    SCOTT F. BROWN
                                    Milwaukee County Corporation Counsel

         BY:    s/ Dale R. Nikolay
                     DALE R. NIKOLAY
                     Assistant Corporation Counsel
                     State Bar No. 1002447
                     Attorney for Defendants, Amika Avery, Jordan Taylor, and Terrell Williams

**P.O. Mailing Address:**
Milwaukee County Office of Corporation Counsel
901 North 9th Street, Room 303
Milwaukee, WI 53233
Telephone:    (414) 278-4087
Facsimile:     (414) 223-1249
Email: dale.nikolay@milwaukeecountywi.gov

10