UNITED STATES DISCTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KEENAN T. KNIGHT,

    Plaintiff,

v.                                          Case No. 23-cv-886

AMIKA AVERY,
JORDAN TAYLOR, and
TERRELL WILLIAMS

    Defendants.

## DECLARATION OF JORDAN TAYLOR

STATE OF WISCONSIN   )
                                ) SS
MILWAUKEE COUNTY    )

    I, Jordan Taylor, declare pursuant to 28 U.S.C. § 1746, and under penalty of perjury that the following is true and correct:

    1.     At all times relevant to this action, I was employed by the Milwaukee County Sheriff's Office ("MCSO"), including on May 31, 2023, held the position of corrections officer ("officer"), and was assigned to the Milwaukee County Jail (the "Jail").

    2.     I base this declaration on my personal knowledge of the facts and circumstances attested to herein and my review of relevant records of Milwaukee County kept in the ordinary course of business.

3. One of my essential duties as an officer at the Jail include ensuring the safety and security of the Jail, its occupants and staff.

4. Occupants that actively and deliberately resist the orders of corrections staff become a threat to the safety and security of the Jail, the staff, and the occupants.

5. Some of the equipment that corrections officers at the Jail carry to gain compliance of an actively resistant occupant include oleoresin capsicum (OC) spray and a taser gun.

6. I am familiar with Keenan Knight and recall him being an occupant in the Jail from December 5, 2021 through October 13, 2023.

7. I recall that Mr. Knight. I recall that he had a reputation of being a resistant individual, and had a large build, standing over 6 feet tall and weighing over 250 pounds. Prior to this incident, I was also aware of numerous physical altercations in which he was involved during his incarceration in the Jail. In fact, I recall an incident about a year prior wherein I was assisting officers with escorting Mr. Knight to disciplinary housing and he injured an officer during the escort.

8. On May 31, 2023, I was assigned to work second shift (1400 – 2230 hours) as a search officer.

9. At approximately 1745 hours, I arrived at 6th floor control for a short assignment. Lieutenant Amika Avery and Officer Terrell Williams were on scene and I was debriefed that we would be conducting cell searches to recover any contraband due to occupants in housing 6B having possible smoking materials.

2

10. Officer Williams and I conducted a cell search in Cell 36 belonging to Keenan Knight and while conducting said search, contraband was found, and four Newport cigarettes, one razor and two pieces of paper with tobacco were confiscated.

11. I, reported back to the 6th Floor – Floor Control where Mr. Knight was located at the time inside a non-contact booth.

12. At approximately 1810 hours I observed Lieutenant Avery at the non-contact booth where Mr. Knight was temporarily housed. Lieutenant Avery informed Mr. Knight that he would be getting moved to housing unit 4A pending discipline. Mr. Knight began refusing this move.

13. I tried to gain compliance from Mr. Knight without confrontation by saying things such as explaining he would be placed on administrative confinement for a longer time if he does not cooperate. Despite my best efforts to verbally persuade Mr. Knight to move out of the non-contact booth, he continued to refuse all legal and lawful orders. In my gut, I knew Mr. Knight was not going to comply because of my past experiences with him. While inside the non-contact visiting booth, Mr. Knight was repeatedly cracking his knuckles and making fists, all of which was indictive to me that Mr. Knight was not going to go without a fight.

14. While Mr. Knight continued to refuse orders, Lt. Avery called for additional officers to arrive on scene due to Mr. Knight's refusal to cooperate with his housing move.

15. Officers do not enter an occupant's cell to cuff him or her. Rather, occupants are required to place their arms voluntarily outside of their cell so their wrists may be

3

handcuffed. This is to ensure that officers are not assaulted inside of occupants' cells.

16. After several attempts to gain voluntary compliance, Officer Williams drew his taser, aimed it at Mr. Knight, and warned Mr. Knight that if he did anything besides place his hands in cuffs, he would be tased.

17. Officer Dortch and I were able to guide Mr. Knight out of the non-contact booth while I was attempting to secure one of his hands in the handcuff portion of the RIPP restraint belt. During this process, Mr. Knight was agitated, tense, and focused on Officer Williams, whose taser remained drawn and aimed at Mr. Knight.

18. I then attempted to secure Mr. Knight's other hand in the handcuff portion of the RIPP restraint belt but was unable due to him tensing up and moving. At this time, Officer Terrell Williams holstered his taser and moved behind Mr. Knight to attempt to secure the RIPP restraint belt around Mr. Knight's waist. At this time, I observed Mr. Knight tense up and ball his fist up, which signified to me he was getting into a pre-attack posture and an attempted assault was imminent. Due to Mr. Knight's continued non-compliance and his act in pulling his arms away from Officer Williams, at approximately 1814 hours Mr. Knight was decentralized to the ground by Officer Williams.

19. While Mr. Knight was decentralized on the ground, I observed him grab Officer Williams' collar. I ordered Mr. Knight to let it go but he refused and he was trying to get up from the ground. At this time, I attempted to stabilize him back to the ground but my efforts were not effective due to Mr. Knight's size and his resistive behavior. I gave Mr. Knight multiple legal and lawful orders to stop resisting and

4

Case 2:23-cv-00886-NJ    Filed 08/01/24    Page 4 of 6    Document 36

let go of Officer Williams' collar without compliance. During this same time, Lt Avery delivered two strong side arm focus strikes to Mr. Knight's abdomen, to no avail.

20. Assessing the dangerousness of the situation, including the fact that Mr. Knight had a RIPP restraint belt that was not secured on his person which he could use as a dangerous weapon at any time, and Mr. Knight's continued level of resistance, at approximately 1814 hours I unholstered my taser and warned staff of my intent to use it by stating "Move, Taser, Taser, Taser" as is proper procedure. I then deployed my taser, striking Mr. Knight in the buttocks and lower back. The taser was effective resulting in Mr. Knight's immediate compliance. I gave Mr. Knight orders to roll over on his stomach and staff was then able to properly secure him in the RIPP restraint belt, thereby diminishing the active threat he posed.

21. After Mr. Knight was medically cleared and photographed, I secured his left arm with staff and escorted him to 4A pending discipline without further issue.

22. I did not observe any officer use excessive force during the incident involving Mr. Knight on May 31, 2023. If I had, I would have notified a superior officer.

    (The remainder of this page is intentionally left blank).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on July 31, 2024.


s/ Jordan Taylor
JORDAN TAYLOR

6

Case 2:23-cv-00886-NJ   Filed 08/01/24   Page 6 of 6   Document 36