UNITED STATES DISCTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KEENAN T. KNIGHT,

    Plaintiff,

v.                                Case No. 23-cv-886

AMIKA AVERY,
JORDAN TAYLOR, and
TERRELL WILLIAMS

    Defendants.

## DECLARATION OF TERRELL WILLIAMS

STATE OF WISCONSIN   )
                                ) SS
MILWAUKEE COUNTY   )

    I, Terrell Williams, declare pursuant to 28 U.S.C. § 1746, and under penalty of perjury that the following is true and correct:

1. At all times relevant to this action, I was employed by the Milwaukee County Sheriff's Office ("MCSO"), including on May 31, 2023, held the position of corrections officer ("officer"), and was assigned to the Milwaukee County Jail (the "Jail"). I began my employment with the MCSO on October 8, 2018 and I currently hold the rank of Sergeant.

2. I base this declaration on my personal knowledge of the facts and circumstances attested to herein and my review of relevant records of Milwaukee County kept in the ordinary course of business.

3. One of my essential duties as an officer at the Jail include ensuring the safety and security of the Jail, its occupants and staff.

4. Occupants that actively and deliberately resist the orders of corrections staff become a threat to the safety and security of the Jail, the staff, and the occupants.

5. I am familiar with Keenan Knight and recall him being an occupant in the Jail from December 5, 2021 through October 13, 2023.

6. I recall that Mr. Knight had a large build, standing approximately 6'4" and weighing approximately 275 pounds. Prior to the incident in this case, I was aware of numerous physical altercations in which he was involved during his incarceration in the Jail. I was also aware that he was disciplined numerous times for being in possession of contraband, including possession of a weapon. Mr. Knight repeatedly disobeyed orders from staff and had issues complying with the rules and the Jail's expectations of its occupants. Further, I also recall that Mr. Knight was placed on administrative segregation multiple times during his incarceration due to his unpredictable and disruptive behavior.

7. On May 31, 2023, I was assigned to work second shift (1400 – 2230 hours) as a Field Training Officer on the 5th Floor – Floor Control.

8. I was radioed by Lieutenant Amika Avery, requesting that I meet her on 6th Floor – Floor Control for a short assignment.

9. Upon my arrival to the sixth floor at approximately 1737 hours, Lieutenant Avery informed me that we would be conducting cell searches to recover any contraband due to occupants in housing unit 6B having possible smoking materials.

10. Keenan Knight was ordered to the 6th floor non-contact booth area so that a search of his cell could be conducted.

11. At approximately 1745 hours, Officer Taylor and I went to Keenan Knight's Cell 36 in housing unit 6B to conduct the search.

12. Upon a search of Mr. Knight's cell, I discovered a bag of coffee with a clear plastic bag hidden inside containing four Newport cigarettes and two pieces of paper filled with tobacco. I also found a razor hidden inside of a brown paper bag. I immediately notified and turned the contraband over to Lieutenant Avery.

13. It was determined by Lieutenant Avery that Mr. Knight, who was housed in Cell 36, would be moved to housing unit 4A, pending discipline due to being in possession of contraband.

14. At approximately 1805 hours, I observed Lieutenant Avery approach the non-contact booth where Keenan Knight was temporarily housed and heard her explain to him that he would be placed on discipline pending a due process hearing due to being in possession of contraband and asked him if he would comply with the changeover process. Occupants being placed on discipline or pending discipline are changed into red jail-issued clothing. Mr. Knight asked Lieutenant Avery if he was going on administrative segregation, and she informed him that he would be placed on administrative segregation once his discipline time was completed and he responded, "well I ain't complying then we might as well get this party started". I took that to mean, from previous experience with Mr. Knight, that he was going to resist orders and our efforts to escort him to a different location within the Jail.

15. Lieutenant Avery radioed for additional staff to respond to the sixth floor due to Mr. Knight's verbal suggestion that he would resist jail staff.

16. An occupant who is not fully restrained in a RIPP restraint belt can pose significant security concerns, particularly an occupant with the size and stature of Mr. Knight. In mere seconds, Mr. Knight would be able to use the belt portion of the restraint device as a weapon to hit or choke officers and/or other occupants. As such, occupants who are not fully restrained in a RIPP restraint device are significant security concerns.

17. Knight continued to refuse all orders and I heard him say "If I'm going on ad-seg I might as well make it for a reason". This confirmed noncompliance, so I drew my taser and informed him that if he did not comply with staff orders to be secured, force can and will be used against him to get him to move to his new housing assignment.

18. I further warned him that if he did anything besides put his hands outside of the cell to be cuffed, he would be tased. In response to this, Mr. Knight stated things to me such as "you want to blow that mother fu\*\*er, you wanna blow it?"

19. At this time, I instructed Officer Jordan Taylor and Officer Deone Dortch to begin securing Mr. Knight's hands into the handcuff portion of the RIPP restraint belt. Mr. Knight was still actively resisting and not permitting Officer Taylor and Officer Dortch to secure him in the RIPP restraint belt so for a second time I informed Mr. Knight that force can and will be used against him if he continued to resist against staff.

4

20. I observed Officer Taylor secure one of Mr. Knight's wrists into the handcuff portion of the RIPP restraint belt, however, Officer Dortch was not successful in securing his other wrist into the handcuff due to Mr. Knight clasping his wrist together to prevent his other wrist from being secured.

21. As Officers Taylor and Dortch continued to secure Mr. Knight's other hand into the handcuff portion of the RIPP restraint belt, I began to place the RIPP restraint Velcro belt around Mr. Knight's waist. Mr. Knight continued to resist, preventing me from being able to secure him in the RIPP restraint belt.

22. After assessing the dangerousness of the situation, and Mr. Knight's continued level of resistance, at approximately 1814 hours I performed a secure head decentralization on Knight to gain his compliance and to prevent injury to staff. This technique is where an officer blankets and secures the occupant's head with proper hand position with the reaction hand cupping the front of the occupant's chin and with the strong side hand positioned over the occupant's eyes and nose. The officer moves slightly backwards from the occupant to move them off center, gives proper verbal commands, pivots along an arc and properly directs the occupant to the ground. Using this trained technique, Mr. Knight was stabilized to the ground.

23. While stabilized on the ground, Mr. Knight continued to resist staff and grabbed the collar of my shirt to pull me closer to him. I secured Mr. Knight's head against the ground and gave him several verbal commands to let go of my shirt. Mr. Knight did not comply with my verbal commands.

24. Officer Jordan Taylor then gave the verbal warning of "Taser Taser" which indicates to staff to clear themselves from the area and to alert that a taser is going

5

Case 2:23-cv-00886-NJ    Filed 08/01/24    Page 5 of 7    Document 37

to be discharged. Officer Taylor discharged his taser striking Mr. Knight in his buttocks and lower back which immediately gained compliance.

25. It must be noted that Knight was not yet fully secured in his RIPP restraint belt until after he was tased.

26. I observed Lieutenant Avery radio master control notifying them of a "Code X" on the 6th floor, which indicates a taser was deployed. Additional staff arrived on scene to assist, including medical staff to medically assess Mr. Knight as is standard protocol following the deployment of a taser.

27. I did not observe any officer use excessive force during the incident involving Mr. Knight on May 31, 2023. If I had, I would have reported the incident to my superior officer.

(The remainder of this page is intentionally left blank).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on July 30, 2024.


s/ Terrell Williams
TERRELL WILLIAMS

7

Case 2:23-cv-00886-NJ    Filed 08/01/24    Page 7 of 7    Document 37