IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

KEENAN T. KNIGHT,

        Plaintiff,

Case No. 23-CV-886

v.

AMIKA AVERY,
JORDAN TAYLOR,
TERRELL WILLIAMS,

PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF FACT

Plaintiff, Keenan T. Knight, pro se submit these responses to Defendants' Proposed Finding of Fact in Support of Their Motion for Summary Judgment.

A. Knight Had a Reputation of Disruptive and Assaultive Behavior in the Jail.

1. Keenan T. Knight ("Knight") was incarcerated in the Milwaukee County Jail (the "Jail") from December 5, 2021 through October 13, 2023. (Hannah Decl. ¶ 6; Williams Decl. ¶ 5; Taylor Decl. ¶ 6; Dingman Decl. ¶ 4).

Response: No dispute.

2. Mr. Knight was known by many because of his rather large build, standing approximately 6'4" and weighing approximately 275 pounds. (Hannah Decl. ¶ 7; LeFlore Decl. ¶ 6; Williams Decl. ¶ 6; Taylor Decl. ¶ 7; Avery Decl. ¶¶5-6).

Response: Dispute. However, immaterial to the defendants' use of force against him.

1

3. Prior to May 31, 2023, Knight engaged in numerous physical altecations and created multiple disturbances during his incarceration in the Jail. (Hannah Decl., Ex. 6, pp.33-76).

Response: Dispute. Objection. Dingman Decl., Ex. 6pp. 33-76 wasn't attached as evidence to support contention. Furthermore, Plaintiff Knight isn't a violent, dsiruptive or hostile inmate and was only found guilty of four of the incidents referenced. (Knight Decl. ¶  )

4. Indeed, Knight received nine major disciplinary write ups, which includes instances of being in possession of contraband, including being in possession of a weapon. (Hannah Decl. ¶ 8; Williams Decl. ¶6; Dingman Decl. ¶ 10, Ex. 5)

Response: Dispute. Knight did receive nine major disciplinary write ups, however, Knight was actually only found guilty of four of those disciplinary write ups. ( Knight Decl. ¶  )

5. Knight routinely disobeyed orders from staff, had issues complying with the jail rules and expectation, and was placed on administrative segregation (ad-seg) multiple times due to his unpredictable and disruptive behavior. (Hannah Decl. ¶ 9; Williams Decl. ¶ 6; Avery Decl. ¶ 6; Nockolay Decl. ¶ 4; Ex.1 Knight Dep. Tr. 21:2-11; Dingman Decl. Ex. 6 pp. 33-76)

Response: Dispute. Knight complied with all orders and directives on May 31, 2023 and his administrative segregation placement was overturned by Inspector Dobson on appeal. (Knight's Decl. ¶  , Ex.  )

6. In fact, Lt. Avery and Officers Williams and Taylor were aware that Knight was in multiple physical altercations and had a history of exhibiting unpredictable and disruptive behavior bef re the May 31, 2023 incident occurred (Williams Decl. ¶ 5-6; Taylor Decl. 6-7; Avery Decl. 5-6)

Response: Dispute. Prior to May 31, 2023, Knight was involved in and found guilty of one physical altercation with another inmate. He was not disruptive or violent on May 31, 2023. (Knight Decl. ¶  )

B. Because of Knight's disruptive behavior on May 31, 2023, objectively reasonable force was necessary to ensure the safety and security of the jail and those within.

7. Due to the discovery of smoke within the housing unit 6B, Lt. Avery ordered Officers Williams and Taylor to assist with conducting cell searches to recover contraband from occupants. (Williams Decl ¶ 8-9; Taylor Decl. 9' Avery Decl. 8-10)

Response: No dispute.

8. To aide in the search of his cell, Mr. Knight was moved to the 6th floor non-contact booth area while both officers Taylor and officer Williams conducted the search. (Williams Decl. ¶ 10-11; Avery Decl. ¶ 9 )

Response: No dispute.

9. Knight initially refused to go into the non-contact booth, but eventually complied with Lt. Avery's order. (Nickolay Decl. ¶ 4; Ex. 1 Dep. Tr. 11:8-14:12, 48:5-49:19)

Response: Dispute. Officer Saavedra came on Knight's cell intercom and stated Knight had a lawyer visit on floor control. Knight went out to floor control and Deputy Rivera also told Knight he had a lawyer visit. Due to not seeing his attorney present , Knight informed Deputy Rivera that he would like to go back to his cell. Lt Avery then approached and informed Knight that he did not have an attorney visit but he was pulled out of his cell so it could be searched. Lt Avery asked Knight to go into the non-contact booth and he complied. (Knight Decl. ¶ 6-12; Nickolay Decl. Ex. 1, Knight Dep. Tr.

10. Inside Knight's cell officers found a bag of coffee with a clear plastic bag hidden inside containing four Newport cigarettes and two pieces of paper filled with tobacco as well as a razor hidden inside of a brown paper bag, all of which are considered contraband and prohibited inside the jail. (Williams Decl. ¶ 12; Taylor Decl. 10; Avery Decl. ¶ 11)

Response: No dispute.

11. After being notified of the contraband, Lt. Avery ordered that Knight be moved to housing unit 4A pending discipline. (Williams Decl. ¶ 13; Avery Decl. ¶ 13)

Response: No dispute.

12. Around the 1800 hours, Captain Hannah responded to the 6th floor of the jail after contraband was found in Knight's cell, photographed the contraband, and order that Knight be placed on administrative confinement because of his history of being an institutional behavioral problem. (Hannah Decl. ¶ 11; Avery Decl. ¶ 12-13)

Response: No dispute.

13. Lieutenant Avery approached the non-contact booth where Knight was temporarily housed and explained to him that he would be placed on discipline pending a due process hearing due to being in possession of contraband and asked him if he would comply with the change over process for occupants being placed on pending discipline. (Avery Decl. ¶ 14; Williams Decl. ¶ 14; Dingman Decl. Ex. 4 @ 18:05:08-18:08:45; Taylor Decl. ¶ 12; Nickolay Decl. Ex. 1, Knight Dep. Tr. 50:5-18)

Response: No dispute.

14. Knight was also informed he would be placed on administrative segregation, to which he responded, "Well I ain't complying then we might as well get this party started" and the cell door in which he was housed is seen visibly moving as if it were kicked by Knight. (Williams Decl. ¶ 14; Dingman Decl. Ex. 4 @ 18:09:00-18:09:06)

Response: Dispute. Lt. Avery informed Knight that he would be moving to 4A pending disciplinary due process. Lt. Avery then asked Knight "Where did you get the cigarettes from?" "Did a officer give you the cigarettes?" When Knight denied ever having any cigarettes and asked why is he being targeted, Lt. Avery responded that she was placing Knight on adseg. Knight very

4

adamantly requested to speak with Captain Hannah regarding the adseg status. Lt. Avery then walked away from the non-contact booth. Knight never stated "Well I aint complying then we might as well get this party started". Lt. Avery was not at or near the non-contact booth when the door is seeing visibly moving. (Knight Decl. ¶ 15-20; Nickolay Decl. Ex. 1, Knight Dep. Tr. Dingman Decl. Ex. 4 video footage 6th floor.)

15. Knight repeatedly demanded to speak with Captain Hannah because he disagreed with his placement on administrative segregation. (Avery Decl. ¶ 14; Nickolay Decl. ¶ 4; Ex. 1, Knight Dep. Tr. 35:15-36:23, 53:11-17, 54:6-13)

Response: No dispute.

16. Lt. Avery again ordered Knight to comply with the legal and lawful order to be placed in a RIPP restraint belt to be escorted to housing unit 4A; Officer Williams, and Taylor and Deputy Sheriff Raul Rivera arrived and also tried to communicate with Knight to gain compliance, but Knight continued to refuse to comply. (Avery Decl. ¶ 16; Taylor Decl. ¶ 13)

Response: Dispute. Knight was not failing to comply with any order but simply silently taking time to get his mental and emotional state together to be placed in adseg. (Knight Decl. ¶ )

17. Indeed, Deputy Rivera informed Knight that he would open the cell door and ordered Knight to place his hands out of the cell when that happened; however, Knight was unresponsive. (Nickolay Decl. ¶ 4, Ex. 1, Knight Dep. Tr. 51:21).

Response: No dispute.

18. Occupants that actively and deliberately resist the orders of correctional staff become a threat to the safety and security of the jail, the staff, and the occupants. (Hannah Decl. ¶ 4; Williams Decl. ¶ 4; Leflore Decl. ¶ 4; Taylor Decl. ¶ 4; Avery Decl. ¶ 4)

5

Response: No dispute. However, Knight did not actively and deliberately resist any orders given. (Knight Decl. ¶ ).

19. Knight continued to refuse all orders and stated "If I'm going on adseg I might as well make it for a reason," which confirmed noncompliance to Officer Williams, so he unholstered his taser, aimed it at Knight, and informed Knight that if he did not comply with staff orders to be secured, force can and will be used against him to move him to his new housing assignment. (Williams Decl. ¶ 17; Taylor Decl. ¶ 16; Dingman Decl. ¶ Ex.3 @ 18:10:40-18:12:53, Ex. 4 @ 18:11:00-18:11:44)

Response: Dispute. Upon Deputy Rivera opening the non-contact cell door, Deputy Rivera and Officer Taylor asked Knight to cuff up, Knight continued to stand silently rubbing his hands toge her in circular motions. Knight never stated "If I'm going to adseg I might as well make it for a reason." In fact, in direct cont adiction, officer Williams' body camera footage show Knight standing silently unresponsive. Officer Williams then pulled out his taser and aimed it at Knight informing Knight if he didn't comply he would be tased. (Dingman Decl. Ex. 3 , body camera footage; Knight Decl. ¶ ; Nickolay Decl. Ex. 1, Knight Dep. Tr.

20. While inside the non-contact booth, Mr. Knight was repeatedly cracking his knuckles and making fists, all of which was indicative to Officer Taylor that Mr. Knight was not going without a fight. (Taylor Decl. ¶ 13)

Response: Dispute. The defendants' allegations are completely false and made in bad faith. Officer Williams was wearing a body worn camera. The body worn camera (BWC) footage clearly shows that Knight was not cracking his knuckles or making fists. I was standing silently and rubbing my hands together nervously in circular motions. (Dingman Decl. ¶ Ex. 3 Body Camera footage, Knight Decl. ¶ ; Nickolay Decl. ¶ Ex. 1; Knight Dep. Tr.

21. Officer Williams further warned Knight that if he did anything besides put his hands outside of the cell to be cuffed, his would be tased, to which Knight stated " you want to blow

that muthafucka, you wanna blow it?" (Williams Decl. ¶ 18; Dingman Ex. 3 @ 18:12:53-18:13:44, Nickolay Decl. ¶ 4, Ex. 1, Knight Dep. Tr. 52:7-19)

Response: No dispute.

22. Officers do not enter an occupant's cell to cuff him or her. Rather occupants are required to place their arms voluntarily outside of their cell so their wrist may be handcuffed to ensure that officers are not assaulted inside of occupants' cell. (Taylor Decl. ¶ 15)

Response: No dispute.

23. At this time, Officer Williams instructed Officer Taylor to begin securing Mr. Knight's hands into the handcuffed portion of the RIPP restraint belt. (Williams Decl. ¶ 19; Dingman Decl. ¶, Ex. 4 @ 18:11:51-18:13:01)

Response: No dispute.

24. A RIPP restraint belt is a velcro belt that is placed around the midsection of an occupant and secured in the back of the occupant. A D-ring is attached to the velcro belt. A metal ring then connects the handcuffs which secures the occupant's hands. (Leflore Decl. ¶ 10; Avery Decl. ¶ 15)

Response: No dispute.

25. At this time, Lt Avery radioed for additional staff to respond to the 6th floor- floor control due to Mr. Knight's continued resistive behaviors, and Officer Deone Dortch was one of the officers who responded. (Williams Decl. ¶ 15; Taylor Decl. 14; Avery Decl. ¶ 18; Dingman Decl. ¶, Ex. 3 @ 18:12:17-18:12:53, )

Response: No dispute.

26. Officer Dortch also tried to gain compliance from Mr. Knight

but was not succesful. (Avery Decl. ¶ 18; Nickolay Decl. ¶ 4; Ex. 1, Knight Dep. Tr. 66:24-67:1)

Response: Dispute. Officer Dortch approached to assist Officer Taylor who had one of my hands cuffed. Officer Dortch and Officer Taylor guided me out of the non-contact booth and successfully secured both of my wrists without incident of any kind because I was not being resistive. (Dingman Decl. Ex. 2, pgs 14-20, 24; Ex. 3 body camera footage, Ex. 4, 6th floor video footage; Knight Decl. ¶  )

27. Officers Dortch and Taylor were able to guide Mr. Knight out of the non-contact booth while Officer Taylor was attempting to secure one of his hands in the handcuff portion of the RIPP restraint belt. (Taylor Decl. ¶ 17; Avery Decl. ¶ 19)

Response: Dispute. Officers Dortch and Taylor did in fact guide Knight out of the non-contact booth. Once outside of the non-contact booth, Officer Dortch and Taylor secured Knight's hands in the handcuffs and maintained a tight secure grip on both of Knight's wrist and forearms. (Dingman Decl. Ex. 3. Ex. 4; Knight Decl. ¶  )

28. During this process, Mr. Knight was agitated, tense, and focused on Officer Williams, whose taser remained drawn and aimed at Mr Knight. (Taylor Decl. ¶ 17; Nickolay Decl. ¶ 4, Ex. 1, Knight Dep. Tr. 56:25-57:23)

Response: Dispute. Knight's attention was not solely focused on Officer Williams. Knight's demeanor was not agitated, tense and in fact, Knight is seen smiling during this process. (Dingman Decl. ¶  Ex. 3, Ex. 4 video footage)

29. Officer Taylor secured one of Knight's wrist into the hand-cuffed portion of the RIPP restraint belt; however, Officer Dortch was not successful in securing his other wrist into the handcuffs due to Knight clasping his hands together to prevent his other wrist from being secured. (Williams Decl. ¶ 20; Dingman Decl. ¶ Ex. 4 @ 18:13:07-18:13:48; Nickolay Decl. ¶ 4, Ex.1

Knight Dep. Tr. 56:25-57:23)

Response: Dispute. This allegation is completely false and again made in bad faith. Video footage of the incident will show that once outside of the non-contact booth Officers Dortch and Taylor did in fact secure both pf Knight's hands into the handcuffs and maintained a secured grip on Knight wrist and forearm. Knight was not resisting nor did Knight clasp his hands together to prevent being secured. (Dingman Decl. Ex. 2 pg. 14-20; Dingman Decl. Ex. 3, Ex. 4; Knight Decl. ¶  )

30. Officer Taylor then attempted to secure Mr. Knight's other hand in the handcuff portion of the RIPP restraint belt but was unable due to him tensing up and moving. (Taylor Decl. 18; Nickolay Decl. ¶ 4, Ex. 1, Knight Dep. Tr. 63:15-64:24)

Response: Dispute. Same answer as supra 28-29.

31. Officer Williams holstered his taser and positioned himself behind Knight and began to place the RIPP restraint velcro belt around Knight's waist; however, Knight continued to resist, preventing Officer Williams from being able to secure Knight. (Williams Decl. ¶ 21; Taylor Decl. ¶ 18; Avery Decl. ¶ 20; Dingman Decl. Ex. 3 @ 18:13:42-18:13:50, Ex. 4 @ 18:13: 42-18:13:50)

Response: Dispute. Officer Williams and Lt. Avery both holstered their taser, which objectively indicates that they did not view me as a threat nor was I resisting. Officer Williams stepped behind me and reached around Knight's body to grab the RIPP belt and pulled back on the RIPP belt towards him. Officers Dortch and Taylor both pulled my hands back towards them. Officer Williams immediately let go of the belt and forcefully and very aggressively wrapped his arms around Knight's forehead and chin area, stepped back and violently yanked me to the ground, in a very awkward and dangerous manner. (Knight Decl. ¶  ; Ex. 4 video footage.)

32. An occupant who is not fully secured in a RIPP restraint

belt can pose significant security concerns, particularly an occupant with the size and stature of Knight. (Hannah 12; LeFlore Decl. 11; Williams Decl. 14; Avery Decl. 17)

Response No. 32  Dispute

This is a hypothetical scenario or what "could have" happen. Defendants are again attempting to use Knight's size and stature as a means of justification to use unnecessary excessive force against Knight

33. In mere seconds, Mr. Knight would be able to use the belt portion of the restraint device as a weapon to hit or choke officers and/or other occupants

Response No. 33  Dispute

Again Defendants are attempting to use a hypothetical situation to justify using excessive force on Knight. Knight was surrounded by six officers and some officers declared Knight was secured in their supplemental reports. (Dingman Decl Ex 2 pg 14-20, 24; Dingman Decl, Ex 4 video footage)

34. At this time, Lt. Avery and officer Taylor observed Knight tense up and ball his fist up, which signified to officer Taylor that Knight was getting into a pre-attack posture and an attempted assault was imminent. (Taylor Decl, 18; Avery Decl, 20)

Response No. 34 Dispute

This allegation is again false and made in bad faith to deceive the court. Video footage will show that officers Dortch and

Taylor both had Knight's hands in the handcuffs and maintained a secured grip on Knight's wrist and forearms. Video footage will contradict defendant's allegation that Knight balled up his fist and/or made any other moves that would indicate that Knight was preparing to attack any officer. (Dingman Decl, Ex.3, Ex.4; Knight Decl., )

35. After assessing the dangerousness of the situation, and Knight's continued level of resistance and the fact that it felt to officer Williams as if Knight was pulling his hands away, officer Williams performed a secure head decentralization technique on Knight to gain his compliance and to prevent injury to staff. (Williams Decl., 22; Taylor Decl., 18; Avery Decl, 20; Dingman Decl., Ex 4 at 18:13:51 - 18:13:55; Nikolay Decl., 4, Ex.1, Knight Dep T. 73:11-14, 74:23-75:22)

Response No. 35 Dispute

Again video footage capturing this situation will contradict defendant's false and bad faith version of events. Knight was not resisting. Officers Dortch and Taylor had both of Knight's hand secured in handcuffs. Officer Williams reached around Knight and pulled on the belt towards him causing officers Dortch and Taylor to both yank my hands back towards them. Knight was not being resistive nor combative. Officer Williams immediately grabbed Knight's head wrapping his arms around Knight's forehead and chin area and stepped
Case 2:23-cv-00886-NJ    Filed 11/08/24    Page 11 of 20    Document 48

11

back in a very awkward and dangerous manner down to the ground from behind. (Knight Decl., 36-39; Dingman Decl Ex 3, Ex 4 video footage)

36. Once on the ground, several officers, including Lt. Avery and officer Taylor, rushed over to Knight to further stabilize him as he was on the ground resisting and had ahold of officer Williams shirt collar. (Avery Decl., 22; Williams Decl., 23; Taylor Decl., 19; Dingman Decl., Ex 4 at 18:13:56 - 18:14:01; Nikolay Decl., 4, Ex-1, Knight Dep Tr. 77:14-21, 81: 6-10)

Response No. 36 Dispute

- Video footage will show that officer Williams awkwardly, aggressively, and dangerously yanked Knight down to the ground by his head. Seven officers, including Williams, Dortch, Taylor, Saavedra, Deputy Rivera, Dangerfield, and Lt. Avery all immediately responded. Although Knight did have an initial adverse reaction Knight's hands remained cuffed and Knight never reached for or grabbed Williams shirt collar. The mentioned officers all had Knight pinned down to the ground from head to feet piled on top of Knight. Knight was not resisting any of the officers. (Dingman Decl, Ex 4; Knight Decl., )

37 Knight was given several commands by officer Williams and Taylor to let him go, but Knight did not comply with these commands.

12

(Williams Decl., 23; Avery Decl., 22-23; Taylor Decl., 19; Dingman Decl., Ex. 3 at 18:14:10 - 18:14:14)

Response No. 37 Dispute

Knight never grabbed officer Williams shirt collar or his person. I do not recall being given any commands to let Williams go especially due to the fact that Knight never grabbed Williams shirt collar or his physical person nor that of any officer

38. Fearing for the safety of officer Williams and to stop Knight from further resisting, Lt Avery attempted to apply a pressure point to Knight's right ear to force him to release officer Williams shirt collar, but it was not successful. (Avery Decl., 24)

Response No. 38 Dispute

Video footage shows that Knight was completely and effectively pinned down by seven officers including Lt Avery. Knight was not resisting the officers. While pinned down Knight felt a hand digging into his eye and face area. Knight later learned through Discovery that it was Lt Avery's hand digging into his eyes and facial area. (Knight Decl., , Nikoley Decl, Ex.1, Knight Dep. Tr.)

39. Lt Avery next delivered two strong side arm focus strikes to Knight's abdomen, which were unsuccessful. (Taylor Decl., 19; Avery

Decl., 24)

Response No. 39  No Dispute

40. Both the pressure point and focus strikes are trained techniques used before escalating the use of force. (Avery Decl., 24)

Response No. 40  Dispute

The use of pressure points and focus strikes are already an escalated use of force from verbal descalation trained tactics

41. Assessing the dangerousness of the situation, including the fact that Knight had a RIPP restraint belt that was not secured on his person which he could have use as a dangerous weapon and Knight's continued level of resistance, at approximately 1814 hours officer Taylor unholstered his taser and warned Staff of his intent to use it by stating "Move, taser, taser, taser" as is proper procedure (Taylor Decl., 20; Williams Decl., 24; Avery Decl., 25; Dingman Decl., Ex. 3 at 18:14:15-18:14:22; Nikolay Decl., 4, Ex. 1, Knight Dep. Tr. 79:24-80:18, 81:6-10)

Response No. 41

video footage will show that although the ripp belt was not wrapped around Knight's waist, Knight was not resisting and was effectively pinned down by seven officers, taylor

included, when Taylor suddenly reach for his taser and yelled "move, taser, taser, taser" and soon as the remainding officers cleared away from Knight, Taylor shot Knight with his taser striking Knight lower left back and upper left buttock causing two metal hook-like prongs to penetrate Knight's skin. (Knight Decl., ; Dingman Decl., Ex 3, Ex 4 Video Footage; Nikolay Decl., Ex 1 Knight Dep. Tr )

42. Officer Taylor then Deployed his taser, striking Knight in the buttocks and lower back. (Taylor Decl., 20; Avery Decl., 26; Dingman Decl., Ex. 3 at 18:14:15 - 18:14:22).

Response No. 42   No Dispute

43. The taser was effective resulting in Knight's immediate compliance and officer Williams was able to escape from Knight's grip. (Taylor Decl., 20; Avery Decl., 26; Dingman Decl., Ex. 4 at 18:14:00 - 18:14:17)

Response No. 43
    Video Footage will show that when Taylor yelled "move, taser, taser, taser the remaining six officers immediately disengaged from Knight. Officer Williams cleared from Knight as Knight was not resisting nor did Knight have a hold on Williams when Taylor shot Knight with his taser. (Knight Decl., ; Dingman Decl., Ex 4 Video Footage, Nikolay Decl., Ex 1, Knight Dep Tr.

44. Officer Taylor was then able to properly secure Knight, thereby diminishing the active threat he posed

   Response No. 44   No Dispute

45. It must be noted that Knight was not fully secured in his RIPP restraint belt until after he was tased. (William Decl., 25; Ex. 3 at 18:14:30 - 18:14:37; Nikolay Decl., 4, Ex. 1 Knight Dep. Tr. 90:21-91:2

   Response No. 45   No Dispute

46. Additional staff arrived, including medical, to remove Knight's taser prongs. (Williams Decl., 26; Taylor Decl., 21; Avery Decl., 27; Dingman Decl., Ex. 3 at 18:16:56 - 18:19:32, Ex 4 at 18:16:56 - 18:19:32)

   Response No. 46   No Dispute

47. Knight continued to act in a resistive manner after being tased. (Hannah Decl., 13-15, 19-21; Leflore Decl., 13-14, Ex 3 at 18:19:29 - 18:19:53, Ex 4 at 18:19:29 - 18:20:15

   Response No. 47   Dispute
      Knight was not being resistive after being tased. Once Knight was stood up by officers Knight partially loss his balance due to trying to put his feet in his shower shoes and officers Taylor, Dortch, and Leflore forcefully pinned

Knight up against the wall. (Dingman Decl., Ex 4 video footage; Nikolay Decl., Ex 1 Knight Dep Tr.

48. However, at approximately 1823 hours, Knight complied with staff and was escorted by officers Dortch, Taylor, and LeFlore to Pod 4A, pending discipline, without further incident. (Taylor Decl., 21; LeFlore Decl., 15; Hannah Decl., 22; Avery Decl., 28; Dingman Decl., Ex. 3 at 18:23:51 - 18:26:01, Ex 4 at 18:23:51 - 18:24:02

Response No. 48   No Dispute

49. The correctional staff present did not observe any officer use excessive force during the incident involving Mr. Knight on May 31, 2023. (William Decl., 27; Taylor Decl., 22; Avery Decl., 29)

Response No. 49
Video footage that captured the entire incident will show how violent, explosive, and dangerously officers responded to Knight. Knight was not being resistive and combative as alleged and both of Knights hands were secured in handcuffs by Dortch and Taylor when Williams created the need for excessive force by pulling on the ripp belt causing Dortch and Taylor pulling back thus creating a reason to use excessive force which resulted in Knight being very aggressively thrown down to the ground, Lt Avery attempting to apply pressure points and striking Knight in the abdomen area

and taylor tasing Knight although Knight was handcuff on the ground pinned down by seven officers. (Dingman Decl. 4; Knights Decl.)

C. KNIGHT'S INJURY WAS DI MINIMUS

50. After Knight was tased, medical staff removed the prongs from his left buttocks and left flank area without difficulty

Response No. 50
Medical staff responded due to Knight being tased. the nurse had to the taser prongs from Knight buttocks and lower back by grabbing and forcefully snatching the medical prongs from Knight's body further causing severe pain and leaving bleeding puncture wounds at entry site. (Knight Decl, 47)

51. The area on Knights body that were hit by the taser prongs were cleaned with normal saline and he denied any other concerns. (Nikolay Decl, 5, Ex 2)

Response No 51   Dispute
Knight never refused medical treatment from the nurse (Dingman Decl, Ex 3, Ex. 4 video footage; Knight Decl, 47-48)

52. Later in the evening on May 31, 2023, Knight was seen by medical staff for complaints of left flank pain from being tased

(Nikolay Decl., 5, Ex. 2)

Response No. 52. No Dispute

53. Medical staff noted that Knight's wounds do not appear reddened and are not draining. (Nikolay Decl, 5, Ex 2)

Response No. 53    No Dispute

D. KNIGHT failed to comply with the statutory Requirements to Bring State law claims

54. Pursuant to Wisconsin Statute section 893.80(1d), the Milwaukee County Clerk's office must be presented with a claim containing the address of the claimant and an itemized statement of relief sought when said matters are alleged against Milwaukee County and/or its employees (Dostanic Decl, 4)

Response No. 54
   Defendants waived this issue. The scheduling order directed Parties to file summary Judgment on exhaustion of remedies no later than December 18, 2023 (ECF Court document 13)

55. If service of a written claim pursuant to Wisconsin Statute Section 893.80(1d) is made on the Milwaukee County clerk, the claim would be loaded by an employee of the Milwaukee County clerk's office into the OnBase notification system. (Dostenic Decl. 5)

Response No. 55   No Dispute

56. A search of the County's OnBase system revealed no claims pertaining to Keenan Knight from May 31, 2023 to the present, which means Mr. Knight did not serve any such claim on the Milwaukee County clerk (Dostenic Decl, 6-7

Response No. 56   No Dispute

Dated at Green Bay, Wisconsin this 30th day September, 2024

Keenan J Knight