UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

Keenan T. Knight

     Plaintiff

   v.             CASE No. 23-CV-886

Amika Avery,

Jordan Taylor,

Terrell Williams,

     Defendants


Amended Response To Defendents proposed
Findings of Fact in response To Defendants
reply in Support of Defendents proposed
Finding of Fact


Plaintiff, Keenan T. Knight, pro se, submit these amended
responses To Defendents proposed finding of fact in support of
their motion for Summary Judgment

A. Knight had a reputation of Disruptive and Assaultive
   behavior in the Jail.

1. Keenan T. Knight ("Knight") was incarcerated in the
   Milwaukee County Jail ("The Jail") from December 5, 2021
   through October 13, 2023. (Hannah Decl. 6; Williams Decl,

RESPONSE: NO DISPUTE

2. Mr. Knight was known by many because of his rather large build, standing approximately 6'4" and weighing approximately 275 pounds. (Hannah Decl. 7; LeFlore Decl. 6; Williams Decl. 6; Taylor Decl. 7; Avery Decl. 5-6).

RESPONSE: NO DISPUTE. However, immaterial to the defendents' use of force against plaintiff

3. Prior to May 31, 2023, Knight engaged in numerous physical altercations and created multiple disturbances during his incarceration in the Jail. (Hannah Decl. 8; LeFlore Decl. 6; Williams Decl. 6; Taylor Decl. 7; Avery Decl. 6; Dingman Decl. Ex. 6 pp 37-76)

RESPONSE: DISPUTE. Objection. Dingman Decl, Ex. 6 pp 33-76 was not attached as evidence to support contention. Furthermore, Plaintiff Knight wasn't a violent, disruptive, and hostile inmate and was only found guilty of four incidents prior to May 31, 2023. (Dingman Decl. Ex.5 pg 1-3; Nikolay Decl.4, Ex 1, Knight Dep Tr. p. 21: 19-25 - 22: 1-2)

4. INDEED, Knight received nine major disciplinary write ups, which includes instances of being in possession of contraband,

including being in possession of a weapon. (Hannah Decl. 8; Williams Decl. 6; Dingman Decl. Ex 5)

RESPONSE: DISPUTE. Knight did receive nine major disciplinary write ups, however, Knight was found guilty only on five of those write ups. (Dingman Decl. Ex 5 pg 1-3; Nokolay Decl. 4, Ex 1, Knight DEP TR. p 21:19-25 – 22:1-2)

5. Knight routinely disobeyed orders from staff, had issues complying with the rules and expectations of the jail, and was placed on administrative segregation multiple times due to his unpredictable and disruptive behaviors. (Hannah Decl. 9; Williams Decl. 6; Avery Decl. 6; Nikolay Decl., 4; Ex 1, Knight Dep Tr. 21:2-11; Dingman Decl. Ex 6 pp 33-76

RESPONSE: DISPUTE. During Knight's twenty-two months in Milwaukee County Jail, December 2021 through October 2023, Knight was found guilty of five instances of rule violations. Knight was placed on administrative segregation two times with one being a result of the May 31, 2023 incident which is the cause of this litigation and the one other instance was overturned by then Inspector Dobson on appeal. (Dingman Decl, Ex 5, pg 1-3; Nikolay Decl. 4, Ex 1 Knight Dep Tr. 42: 6-14)

6. In fact, Lt. Avery and Officers Williams and Taylor were aware that Knight was in multiple physical altercations and had history of exhibiting unpredictable and disruptive behaviors before the May 31, 2023 incident occurred (Williams Decl, 5-6; Taylor Decl, 6-7; Avery Decl, 5-6

RESPONSE: DISPUTE. Prior to May 31, 2023, Knight was found guilty of one physical altercation with another inmate. (Dingman Decl. Ex 5 pg 1-3; Nikolay Decl 1, Ex 1 Knight Dep Tr. 29: 23-25

B. Because of Knight's disruptive behavior on May 31, 2023, objectively reasonable force was necessary to ensure the safety and security of the Jail and those within

7. Due to the discovery of smoke within the housing unit 6B, Lt. Avery ordered officers Williams and Taylor to assist with conducting all searches to recover contraband from occupants. (Williams Decl. 8-9; Taylor Decl., 9; Avery Decl., 8-10)

RESPONSE: No Dispute

8. To aide in the search of his cell, Mr. Knight was moved to another cell. Once Knight and officials both arrived, while both officers

Taylor and officer Williams conducted the search. (Williams Decl, 10-11; Avery Decl., 9)

RESPONSE: No DISPUTE

9. Knight initially refused to go into the non-contact booth, but eventually complied with Lt. Avery's order. (Nikolay Decl. 4, Ex 1, Knight Dep TR. 11:8-14:12, 48:5-49:19

RESPONSE: DISPUTE. officer Saavedra came on Knight's cell intercom and stated Knight had a lawyer visit on floor control. Knight went out to floor control where Deputy Rivera also told Knight he had a lawyer visit. Due to not seeing his attorney present, Knight informed Deputy Rivera that he would like to go back to his cell. Lt Avery then approached and informed Knight that he did not have an attorney visit but he was pulled out of his cell so it could be Searched Lt. Avery asked Knight to go into the non-contact booth and he complied. ( Knight Decl, 6-12; Nikolay Decl, 4, Ex 1 Knight Dep TR. pg 10:16-25, 11:1-25, 12, 13, 14:1:12)

10. Inside Mr. Knight's cell the officers found a bag of coffee with a clear plastic bag hidden inside containing four newport cigarettes and two pieces of paper filled with ~~tobacco~~ ... hidden inside a brown paper

bag, all of which are considered contraband and prohibited inside the Jail. (Williams Decl. 12; Taylor Decl. 10; Avery Decl. 11)

RESPONSE: NO DISPUTE

11. After being notified of the contraband, Lt. Avery ordered that Knight be moved to housing unit 4A, pending discipline (Williams Decl. 13; Avery Decl. 13)

RESPONSE: NO DISPUTE

12. Around the 1800 hours, Captain Hannah responded to the 6th floor of the Jail after contraband was found in Knight's cell, photographed the contraband, and ordered that Knight be placed on administrative confinement because of his history of being an institutional behavioral problem. (Hannah Decl. 11; Avery Decl. 12-13)

RESPONSE: No Dispute

13. Lieutenant Avery approached the non-contact booth where Mr. Knight was temporarily housed and explained to him that he would be placed on discipline pending a due process hearing due to being in possession of contraband and asked him if he would comply with the changeover process. For Knight's being placed on pending discipline.

(Avery Decl., 14; Williams Decl., 14; Dingman Decl., Ex. 4 at 18:05:08 – 18:08:45; Taylor Decl., 12; Nikolay Decl., 4. & 1. Knight Dep. Tr 50:5-18)

RESPONSE: No DISPUTE

14. Knight was also informed that he would be placed on administrative segregation, to which he responded "Well I aint complying then – we might as well get this party started" and the cell door in which he was housed is seen visibly moving as if it were kicked by Knight. (Williams Decl., 14; Dingman Decl., Ex 4 at 18:09:00 – 18:09:66)

RESPONSE: DISPUTE. Lt. Avery did inform Knight that he would be moving to 4A pending disciplinary due process. Lt. Avery did upon conversating with Knight inform Knight that she was placing Knight on adseg. Lt. Avery then walked away from the non-contact booth. Knight never stated to Avery or any other officers "Well I aint Complying then we might as well get this party Started". Lt. Avery was not at or near the non-contact booth when the door is seen visbly moving. ( Knight Decl., 15-20; Nikolay Decl., 4, Ex1

at T: 32 – 36:1-24  48: 9-25 – 49:1-20 ;

Dingman Decl., Ex 4 at 18:05:00 - 18:09:06 )(Knight Decl., 21-23

15. Knight repeatedly demanded to speak with Captain Hannah because he disagreed with his placement on administrative segregation. (Avery Decl., 14; Nikolay Decl., 4, Ex1 Knight Dep. Tr. 35:15 - 36:23, 53:11-17, 54:6-13)(Knight Decl., 22

RESPONSE: NO DISPUTE

16. Lt. Avery again ordered Knight to comply with the legal and lawful order to be placed in a ripp restraint belt to be escorted to housing unit 4A; officers Williams, and Taylor and Deputy sheriff Raul Rivera arrived and also tried to communicate with Knight to gain compliance, but Knight continued to refuse to comply

RESPONSE: DISPUTE. Knight was not failing to comply with any order but simply silently taking time to get his mental and emotional state together to be placed on adseg. (Knight Decl., 25

17. Indeed, Deputy Rivera informed Knight that he would open the cell door and ordered Knight to place his hands out of the cell when that happened; however, Knight was unresponsive (Nikolay Decl., 4, Ex 1, Knight Dep TR. 51: 1-21

RESPONSE: NO DISPUTE

18. Occupants that actively and deliberately resist the order of Corrections staff become a threat to the safety and security of the Jail, the staff, and the occupants. (Hannah Decl., 4; Leflore Decl, 4; Williams Decl., 4; Taylor Decl., 4; Avrey Decl., 4)

RESPONSE: No DISPUTE. However, Knight did not actively and deliberately resist orders given. (Knight Decl., 25, 34)

19. Knight continued to refuse all orders and stated "If Im going on adseg I might as well make it for a reason", which confirmed noncompliance to Officer Williams, so he unholstered his taser, aimed it at Knight, and informed Knight that if he did not comply with staff orders to be secured, force can and will be used against him to get him to move to his new housing assignment. (Williams Decl., 17; Taylor Decl, 16; Dingman Decl., Ex 3 at 13:10:40 - 18:12:53, Ex 4 at 18:11:00 - 18:11:44)

RESPONSE: DISPUTE. Upon Deputy Rivera opening the non contact Cell door, Deputy Rivera and Officer Taylor asked Knight to cuff up, Knight continued to stand silently rubbing his hands together in circular motions. Knight never stated "if I am going on adseg I might as

Well make it for a reason." In fact, in direct contradiction, officer Williams' body camera footage show Knight standing silently unresponsive. Officer Williams then pull out his taser and aim it at Knight informing Knight that if he didn't comply he would be tased. (Dingman Decl Ex 3 body camera footage at 18:12:01 - 18:13:20, Ex 4 at 18:12:00 - 18:13:10; Knight Decl., 26, 30-32, Ex 1 pg 1, Ex 2 pg 1-4; Nikolay Decl., 4, Ex1, Knight Dep Tr. 50:10-25, 51:1-21)

20. While inside the non contact booth, Mr. Knight was repeatedly cracking his knuckles and making Fist, all of which was indicative to officer Taylor that Knight was not going to go without a fight. (Taylor Decl, 13)

Response: DISPUTE. Knight cannot speculate on officers Taylor perceptions or perspectives, However, The allegations are completely false and made in bad faith. Knight was not and did not crack his knuckles or make fist but was standing silently rubbing my hands together in a circular motion. (Dingman Decl., Ex 3 at 18:12:55 - 18:13:00; Knight Decl., 25, 28, Ex 2 pg 1-4; Nikolay Decl., 4, Ex 1 Knight Dep Tr. 51: 9-21

21 Officer williams further warned Knight that if he did anything besides put his hands outside of the cell to be cuffed, he would

mother fuxxxer, you wanna blow it. (Williams Decl., 18; Dingman Decl., Ex 3 at 18:12:53 - 18:13:44; Nikolay Decl., 4, Ex.1 Knight Dep Tr. 52: 7-19

RESPONSE: No DISPUTE. However, Knight was in the process of being handcuffed before Knight stated the above-mentioned. (Dingman Decl., Ex 3 at 18:12:01 - 18:13:43; Knight Decl., Ex 1 pg 1-2, Ex 2 pg 3-5)

22. Officers do not enter an occupants cell to cuff him or her. Rather, occupants are required to place their arms voluntarily outside of their cell so their wrist may be handcuffed to ensure that officers are not assaulted inside of occupants cell. (Taylor Decl., 15)

RESPONSE: No DISPUTE

23. At this time, officer Williams instructed officer Taylor to begin Securing Mr. Knight hands into the handcuff portion of the ripp restraint belt. (Williams Decl., 19; Dingman Decl, Ex 4 at 18:11:51 - 18:13:01

RESPONSE: DISPUTE. officer Williams did in fact instruct officer taylor to begin securing Knight's hands. (Dingman Decl. Ex 3 18:12:01 - 18:13:20; Ex 4 at 18:11:50 -

24. A RIPP restraint belt is a velcro belt that is placed around the midsection of an occupant and secured in the back of the occupant. A D-ring is attached to the velcro belt. A metal ring then connects the D-ring to the handcuffs which secures the occupants hands. (Leflore Decl., 10; Avery Decl., 15)

RESPONSE: NO DISPUTE

25. At this time, Lt. Avery radioed for additional staff to respond to the 6th Floor-Floor control due to Mr. Knights continued resistive behaviour, and officer Deone Dortch was one of the officers who responded. (Williams Decl., 15; Taylor Decl., 14; Avery Decl., 18; Dingman Decl., Ex 3 at 18:12:17 - 18:12:53, Ex 4 at 18:12:17 - 18:12:53)

RESPONSE: DISPUTE. Lt. Avery did make a radio call for additional staff to respond to 6th Floor Floor Control and officer Dortch was first officer to respond. Knight Decl., 28-32, Ex 2 pg 1-3; Dingman Decl Ex. 3 at 18:12:01 - 18:13:00; Avery Decl, 18)

26. officer Dortch also tried to gain compliance from Mr. Knight but was not successful. (Avery Decl., 18; Nikolay Decl 4, Ex.1 Knight Dep. Tr. 66:24 - 67:1.

RESPONSE: DISPUTE. OFFICER Dortch did in fact approach to assist OFFICER Taylor who had one of my hands cuffed. OFFICER Dortch and OFFICER Taylor guided Knight out of the non-contact booth and successfully secured both of Knight's wrist in handcuffs without incident of any kind because Knight was not being resistive. (Dingman Decl. Ex 2 pg 14-20; Ex 3 at 18:13:00 – 18:13:43, Ex 4 at 18:13.10 – 18:13:42; Knight Decl., 32-37, Ex 1 pg 1-3, Ex.2 pg 5, Nilколay Decl. 4, Ex 1, Knight Dep Tr 51:23 – 25, 52:1-6)

27. OFFICERS Dortch and Taylor were able to guide Mr. Knight out of the non-contact booth while officer Taylor was attempting to secure one of his hands in the handcuff portion of the Ripp restraint belt. (Taylor Decl, 17; Avery Decl, 19)

RESPONSE: DISPUTE. OFFICERS Dortch and Taylor did in fact guide Knight out of the non-contact booth. Once outside of the noncontact, OFFICERS Dortch and Taylor secured both Knight's hands in the handcuffs and maintained a tight secure grip of both of Knights wrist and forearms. (Dingman Decl Ex 3 at 18:13:00 – 18:13:52; Ex 4 at 18:13:00 – 18:13:42; Knight Decl. 33-36, Ex1. pg 1-4, Ex 2 pg 4-7, Nilколay Decl., 4, Ex 1, Knight Dep TR 54:20-25 – 58:1-2)

28. During this process, Mr. Knight was agitated, tense, and focused on Williams, whose tasers remained drawn and aimed at Mr. Knight. (Taylor Decl., 17; Nikelay Decl, 4, Ex 1, Knight Dep Tr. 56:25 - 57:23

RESPONSE: DISPUTE. Knight's attention is not solely focused on officer Williams. Knights Demeanor was not agitated, tense, but in fact, Knight is seen smiling during this process. (Dingman Decl. Ex 3 at 18:12:57 - 18:13:50, Ex 4 at 18:13:05 18:13:49; Knight Decl. Ex 1 pg 1-3

29. Officer Taylor secured one of Knight's wrists into the handcuff portion of the RIPP Belt; however, Officer Dortch was not successful in securing his other wrist into the handcuff due to Knight clasping his hands together to prevent his other wrist from being secured. (Williams Decl., 20; Dingman Decl Ex 4 at 18:13:02 - 18:13:48; Nikelay Decl 4, Ex 1, Knight Dep Tr. 56:25 - 57:23

RESPONSE: DISPUTE. This allegation is false and made in bad faith. Video footage of the incident show that once outside of the non-contact booth officers Taylor and dortch did in fact secure both of Knights hands into the handcuffs and maintained a secured grip on Knights wrist and forearm. Knight was

as his other hands together

14

To prevent being secured. (Dingman Decl. Ex 2 pg 14-20, Ex 3 at 18:13:00 - 18:13:52, Ex 4 at 18:13:07 - 18:13:49; Knight Decl., 33-36, Ex 1, pg 1-3, Ex 2 pg 5-7; Nikolay Decl 4, Ex 1 Knight Dep Tr. 58: 4-24

30. Officer Taylor then attempted to secure Ms. Knight's other hand in the handcuff portion of the RIPP restraint belt was unable due to him tensing up and moving. (Taylor Decl., 18; Nikolay Decl 4, Ex 1, Knight Dep Tr. 63: 15 - 64:24

RESPONSE: DISPUTE. This allegation is false and made in bad faith. Officers Dortch and Taylor were able to secure both of Knight's hands in the handcuff portion of the RIPP restraint belt. (Dingman Decl Ex 2 pg 14-20, Ex.3 at 18:13:00 - 18:13:52, Ex 4 at 18:13:07 - 18:13:49; Knight Decl., 33-36, Ex 1. pg 1-4, Ex 2 pg 5-7; Nikolay Decl, 4, Ex 1, Knight Dep Tr. 58: 4-24

31. Officer Williams holstered his taser and positioned himself behind Knight and began to place the RIPP restraint Velcro belt around Knight's waist; however, Knight continued to resist, preventing officer Williams from being able to secure Knight. (Williams Decl, 21; Taylor Decl, 18; Avery Decl, 20; Dingman Decl, Ex.3 at 18:13:42 - 18:13:50, Ex 4 at 18:13:42 - 18:13:50

RESPONSE: DISPUTE. Officers Williams and Avery both

holstered their taser, which objectively indicates that they
did not view me as a threat nor was I resisting. Officer
Williams did in fact step behind me and reached around
Knight's body to grab the Ripp belt and pulled back on the
Ripp belt towards him. Knight was not resisting. Officer
Dortch and Taylor both pulled my hands back towards them.
Officer William immediately let go of the belt and forcefully
and very aggressively wrapped his arms around Knight's
forehead and chin area, stepped back and violently yanked
Knight to the ground in a very awkward and dangerous
manner. (Dingman Decl., Ex 3 at 18:13:43 - 18:13:52, Ex 4 at
18:13:40 - 18:13:52 ; Knight Decl., 37-40, Ex 1 pg 3-7, Ex 2 pg 5-7;
Nikolay Decl., 4, Ex 1 Knight Dep Tr. 59: 9-12, 65: 3-25 - 66: 1-9,
70 - 72:1-10)


32. An occupant who is not fully secured in a Ripp restraint
belt can pose significant security concerns, particularly
an occupant with the size and stature of Knight.
(Hannah Decl., 18 ; Leflore Decl, 11 ; Williams Decl, 16 ; Avery
Decl, 17)


RESPONSE: DISPUTE. Object as This is a hypothetical of
what could have happen. Again Defendants
are attempting to use Knight size and stature
as a mean to pre-justify the use of unnecessary
excessive force against Knight. Factors more

conclusory statements without evidentiary support are insufficient on summary judgment. Jamison-Bey 867 f.2d at 1048. This response is also argument, thus should be deemed disputed

33. In mere seconds, Mr. Knight would be able to use the belt portion of the restraint device as a weapon to hit or choke officers and/or other occupants

RESPONSE: DISPUTE. object. This response is argument and not appropriate for summary judgment. See Scherer, 975 f.2d at 361. Conclusory statements without evidentiary support are insufficient on summary judgment, see Jamison-Bey 867 f.2d at 1048. Furthermore without waiving objection Defendants are inserting a hypothetical to justify use of force. Knight was surrounded by six officers in total and same officers declared Knight secured in their supplemental reports. (Dingman Decl, Ex 2 pg 14-20, 24, & 4 at 18:13:42 - 18:13:51

34. At this time, Lt. AVERY and OFFICER Taylor observed Knight tense up and ball his fist up, which signified to officer taylor that Knight was getting into a pre-attack posture and attempted assault was imminent. (Taylor Decl., 18; Avery Decl., 20)

RESPONSE: DISPUTE. Knight cannot speculate on officer's Taylor

Subjective perspective, however, Knight Do not recall balling up his fist or making any such threating move that would indicate that Knight was preparing to attack any officer. (Dingman Decl, Ex 3 at 18:13:00 - 18:13:52, Ex 4 at 18:13:25 - 18:13:51; Knight Decl, 37, Ex 1 pg 1-5, Ex 2 pg 5-7)

35. After assessing the dangerousness of the situation, and Knight's continued level of resistance and the fact that it felt to officer Williams as if Knight was pulling his hands away, officer williams performed a secure head decentralization technique on Knight to gain his Compliance and prevent injury to staff. (Williams Decl., 22; Taylor Decl., 18; Avery Decl., 20; Dingman Decl, &1 at 18:13:51 - 18:13:55; Nikolay Decl., 4, Ex 1 Knight Dep Tr. 73:11-14, 74:23-75:22)

RESPONSE: DISPUTE. Knight was not resisting and officers Dortch and Taylor had both of Knights hands secured in handcuff and maintained a secure grip of Knight wrist and forearm area. Officer Williams from behind Knight reached around Knight and pulled on the belt towards him. Officers Dortch and Taylor both yanked my hands back towards them. Knight was not being resistive nor combative, officer Williams immediately and very suddenly grabbed Knight head towards his body around Knights

forehead and chin area and stepped back in a very awkward
and dangerous manner down to the ground from behind.
(Knight Decl, 36-37, Ex 1 pg 4-7, Ex 2 pg 6-7; Dingman Decl
Ex 3 at 18:13:45 - 18:13:58, Ex 4 at 18:13:42 - 18:13:52;
Nikolay Decl, 4, Ex.1, Knight Dep T. 70-72:1-10, 73:18-25, 74:
1-22)


36. Once on the ground, several officers, including Lt. Avery and
officer Taylor, rushed over to Knight to further stabilize
him as he was on the ground resisting and had ahold of
officer Williams shirt collar. (Avery Decl, 22; Williams Decl,
23; Taylor Decl, 19; Dingman Decl, Ex 4 at 18:13:56 - 18:14:01;
Nikolay Decl., 4, Ex 1 Knight Dep Te 77:14-21, 81:6-10

RESPONSE: DISPUTE. AFTER officer Williams awkwardly,
aggressively, and dangerously yanked Knight down to
the ground by his head, Seven officers, including
Williams, Dortch, Taylor, Saavedra, Deputy Rivera,
Dangerfield, and Lt. Avery all immediately responded.
Although Knight did have an adverse reaction
Knights hands remained cuff and Knight Did not
reach and grab officer Williams shirt collar. The
mentioned officers pinned Knight down to the
ground from head to feet piled on top of Knight
at which point Knight was not resisting any of

(Dingman Decl, Ex 4 at 18:13:51 - 18:14:12;

Knight Decl. 40-44, Ex 1 pg 6-12

37. Knight was given several commands by officers Williams and Taylor to let him go, but Knight did not comply with those commands. (Williams Decl., 23; Avery Decl., 22-23; Taylor Decl., 19; Dingman Decl. Ex 3 at 18:14:10 - 18:14:14)

Response: Dispute. Knight was subdued and pinned down to the ground. Knight never grabbed officer Williams shirt collar or his person. I do not recall being given any orders or command to let williams go especially due to fact that Knight never grabbed Williams shirt collar or his physical person nor that of any officer. (Knight Decl., 43, & 1 pg 7-12; Dingman Decl., Ex 4 at 18:13.52 - 18:14:12; Nikolay Decl. 4, & 1 Knight Dep Tr. 85:7-25 - 86:1-22

38. Fearing for the safety of officer Williams and to stop Knight from further resisting, Lt Avery attempted to apply a pressure point to Knight's right ear to force him to release officer Williams shirt collar, but it was not successful (Avery Decl., 24)

Response: Dispute. Knight was completely and effectively pinned down and subdued by seven officers including Lt. Avery. Knight was not resisting, however while pinned down

Knight later learned through Discovery that that was Lt Avery's hand digging into his eyes and facial area as her way of attempting a pressure point. (Knight Decl., 43-44, Ex 1, pg 8-11, Nikolay Decl., 4, Ex 1, Knight Dep In 83: 4-14; Oingman Decl Ex 4 at 18:13:53 - 18:14:12

39. Lt. Avery next delivered two strong side arm focus strikes to Knights abdomen, which were unsuccessful. (Taylor Decl, 19; Avery Decl., 24

RESPONSE: No Dispute

40. Both the pressure point and focus strikes are trained techniques used before Escalating the use of force. (Avery Decl., 24)

RESPONSE: DISPUTE. The use of Pressure Points and Focus strikes are already an Escalating use of Force From verbal descalations trained tactics (Defendants response to Plaintiff request for Production of Documents, Ex H, Milw county Jail custodial manual - use of force, pg 3

41. Assessing the dangerousness of the situation, including the fact that Knight had a Ripp restraint belt that was not secured on his person which he could use as a dangerous weapon,

hours Officer Taylor unholstered his taser and warned staff of his intent to use it by stating "Move, Taser, Taser, Taser" as is proper procedure. (Taylor Decl, 20; Williams Decl, 24; Avery Decl; 25; Dingman Decl, Ex 3 at 18:14:15 - 18:14:22; Nikolay Decl. 4, Ex 1 Knight Dep Tr. 79:24-80:18, 81:6-10).

RESPONSE: DISPUTE. Although the RIPP restraint belt is not wrapped around Knights waist, Knight was pinned down and subdued by seven officers including Taylor and Knight was not resisting when taylor in fact yelled Move, TASER, TASER, TASER and soon as the other officers cleared Knight Taylor shot Knight with his Taser striking Knight in the lower left back and upper left buttock causing two metal hook style prongs to penetrate Knights skin. (Knight Decl., 45 - 46, Ex 1 pg 11-15; Dingman Decl, Ex 4 at 18:14:10 - 18:14:16; Nikolay Decl 4, Ex 1 Knight Dep Tr 87.1-23

42. Officer Taylor Then deployed his taser, Striking Knight in the buttocks and lower back (Taylor Decl, 20; Avery Decl, 26; Dingman Decl, Ex 3 at 18:14:15 - 18:14:22

RESPONSE: NO DISPUTE

43. The taser was effective resulting in Knight's immediate

Knights grip ( Taylor Decl., 20; Avery Decl., 26; Dingman Decl., Ex 4
at 18:14:00 - 18:14:17 )

RESPONSE: DISPUTE. Officer Williams cleared from Knight as
Knight was subdued and not resisting nor did Knight
have a hold on Williams or any other officer when
Taylor shot Knight with his Taser. Taylor yelled move,
Taser, Taser, Taser and the officers including Williams
immediately disengaged from Knight. ( Knight Decl., 45,
& 1 pg 11-15; Dingman Decl., Ex 4 at 18:14:00 -18:14:17;
Nikolay Decl., 4, Ex 1 Knight Dep Tr. 87:1-23, 88:10-20

44 Officer Taylor was then able to properly secure Knight,
thereby diminishing the active threat he posed. (Taylor Decl
20; Nikolay Decl, 4 Ex 1 Knight Dep Tr. 90:21-91:2

RESPONSE No DISPUTE

45 It must be noted that Knight was not fully secured
in his ripp belt until after he was tased. ( Williams Decl., 25,
Ex 3 at 18:14:30 - 18:14:37

RESPONSE: No DISPUTE

46. Additional staff arrived, including medical, to remove Knights

Dingman Decl. Ex 3 at 18:16:56 - 18:19:32, Ex 4 at 18:16:56 -
18:16:56 - 18:19:32)


RESPONSE: No DISPUTE


47. Knight continued to act in a resistive manner after being
tased. (Hannah Decl, 13-15, 19-21; Leflore Decl., 13-14, Ex 3 at
18:19:29 - 18:19:52, Ex 4. at 18:19:29 - 18:20:15


RESPONSE: DISPUTE. After being Tased Knight continued laying
on the ground not resisting any officer but asked
officer Taylor "why did you tase me" he replied "G"
you tripping. Knight Then asked Williams why did
he Just grab my head and threw me to the ground
which he replied "you were slipping away, pulling away,
Refusing to be secured. Knight was not acting in
a resistive manner. (Knight Decl., 45-47; Dingman
Decl Ex 3 at 18:14:25 - 18:16:56, Ex 4 at 18:14:25 - 18:16:56
Nikolay Decl. 4, Ex 1, Knight Dep Tr. 88:21-25, 90:1-21)


48 However, at approximately 1823 hours, Knight complied with
Staff and was escorted by officer Dortch, Taylor and Leflore
to Pod 4A, pending discipline, without further incident.
(Taylor Decl 21; Leflore Decl, 15; Hannah Decl, 22; Avery Decl
28; Dingman Decl, Ex 3 at 18:23:51 - 18:26:01, Ex 4 at 18:23:51
- 18:23:51, Ex 18:24:02)

RESPONSE: NO DISPUTE

49. The Correctional staff present did not observe any officer use
   Excessive Force during the incident involving Mr. KNIGHT on
   May 31, 2023. (Williams Decl, 27; TAYLOR DECL, 22; AVERY DECL,
   29)

RESPONSE. DISPUTE. Knight cannot speculate on the defendants
   perspective subjectively, thus objecting. without waiving
   objection it is undisputed that officers Williams,
   Taylor, and Lt. Avery all use forced against Knight.
   (Dingman Ex 4 @ 18:13:51 - 18:14:25)

C. KNIGHTS INJURY WAS DI MINIMUS

50. After Knight was tased, medical Staff removed the prongs
   from his left buttocks and left flank area without
   difficulty (Nikolay Decl, 5. Ex 2)

RESPONSE: DISPUTE. Medical staff did respond to Knight being
   Tased. The nurse removed the taser prongs from Knight
   buttock and lower back by grabbing and forcefully
   Snatching the medical prongs from Knight's body
   Causing Severe pain and leaving bleeding puncture
   wounds at Entry site. (Knight Decl, 48; Dingman Decl

51. The area on Knight body that was hit by the taser were cleaned with normal saline and he denied any other concerns. (Nikolay Decl., 5, & 2

RESPONSE: DISPUTE. Knight do not recall if the area hit by the taser was cleaned with normal saline and Knight did not deny any other concerns. (Knight Decl. 49; Dingman Decl. & 3@18:16:56 - 18:19:32, & 4 @ 18:16:56 - 18:19:32; Nikolay Decl., 4, Ex.] Knight Dep tr 91:12 - 92:9.)

52. Later in the evening on May 31, 2023, Knight was seen by medical staff for complaint of left flank pain from being tased. (Nikolay Decl., 5, Ex.2

RESPONSE: No DISPUTE

53 Medical Staff noted that Knight's wounds do not appear reddened and are not draining." (Nikolay Decl., 5 & 2)

RESPONSE: No DISPUTE

D. KNIGHT FAILED TO COMPLY WITH THE STATUTORY REQUIREMENTS TO BRING STATE LAW CLAIMS

54. Pursuant to Wisconsin statute Section 893.80 (1d), the
Milwaukee County Clerk's office must be presented with a
claim containing the address of the claimant and an
itemized statement of the relief sought when said
matters are alleged against Milwaukee County and/or its
Employee. (Dostanic Decl., 4)

RESPONSE: Objection. Defendant Waived this issue
without waiving objection Knight do not deny
the language of § 893.80(1d), however, the
Scheduling order directed defendant to file
Summary Judgment on Exhaustion of remedies by
December 18, 2023 (ref Court Document 13

55. If Service of a written claim pursuant to Wisconsin
Statute Section 893.80.(1d) is made on the Milwaukee
Clerk, the claim would be loaded by an Employee of
the Milwaukee County clerk's office into the OnBase
notification System. (Dostanic Decl., 5)

RESPONSE: No Dispute

56. A Search of the County's OnBase System revealed no
claims pertaining to Keenan Knight from May 31, 2023 to
present, which means Mr. Knight did not serve any such
claim upon the Milwaukee County clerk. (Dostanic Decl., 6-7)

RESPONSE: No Dispute

Plaintiff Proposed finding of facts to defendants

57. Plaintiff Knight was confined at Milwaukee County Jail for twenty-two months from 12/5/2021 through 10/13/2023 (Knight Decl, 4).

58. During plaintiff twenty-two month stay in the Jail plaintiff received nine disciplinary write ups but were only in fact found guilty of five of those write ups. (Bingman Decl., Ex 5 pg 1-3

59. Prior to May 31, 2023, Plaintiff was placed on administrative Segregation, however, that decision was appealed and later over-turned by then inspector Dobson. (Nikolay Decl 4, Ex 1 Knight Dep Tr 42:6-14)

60. Prior to May 31, 2023, Plaintiff was found guilty of one physical altercation involving another inmate in the Jail. (Dingman Decl, Ex 5 pg 1-3)

61. On May 31, 2023, after smelling smoke on the unit and ordering Everybody to lock in, officer Saavedra came on Knight's cell intercom and stated that Knight had a

Nikolay Decl, 4, Ex. 1., Knight Dep. Tr. 10:16-25, 11:1-2)

62. Plaintiff Exited his cell and went out to floor control under the false pretense that his attorney was at the Jail to visit him. (Knight Decl., 9; Nikolay Decl 4, Ex 1, Knight Dep. Tr 11: 8-18)

63. Once Knight was on floor Control, Deputy Rivera again informed Knight that he had a lawyer visit and asked me to go into the non-contact booth. (Knight Decl., 10; Nikolay Decl 4, Ex 1, Knight Dep Tr. 11:18-25 - 12:1-7)

64. Based on Plaintiff Personal Knowledge and experience it is customary practice for attorneys to already be present when inmates arrive for attorney visits (Knight Decl, 11; Nikolay Decl. 4, Ex 1, Knight Dep Tr. 12:16-24)

65. Knight, not seeing his attorney, informed Deputy Rivera that he did not want the attorney visit and wanted to go back to his cell. (Knight Decl., 13; Nikolay Decl. 4, Ex 1, Knight Dep Tr. 12: 14-25, 13:1-9)

66. Lt. Avery then approached from Floor Control and informed Knight that the real actual reason I was out on floor Control is so that they could Search my cell and _____ then to go into the non-contact booth,

to which Knight complied without incident. (Knight Decl., 14;
Nikolay Decl., 4, Ex 1 Knight Dep Tr. 13:12 - 14:12

67. After searching Knight's cell and returning to floor control,
Avery approach the non-contact booth and inform Knight
that his cell was searched and they found four cigarettes
and tobacco wrapped in paper. (Knight Decl, 18; Nikolay Decl.
4, Ex 1, Knight Dep Tr. 32:1-18)

68. Avery repeatedly asked Knight over and over " where did
you get the cigarettes from?" " Did a officer give you the
cigarettes?" (Knight Decl., 19; Nikolay Decl 4, Ex 1, Knight Dep Tr.
33:21-24)

69. Upon Knight denying having cigarettes, and asking why is
he being targeted, Lt AVERY informed Knight that he would
be moving to unit 4A pending disciplinary action and that
Knight would be placed on administrative segregation. (Knight
Decl., 21; Nikolay Decl., 4. Ex 1, Knight Dep Tr. 34: 5-17;

70. At No point Did Knight make any threats towards any
officer nor did Knight ever state " I aint complying, we
might as well get the party started. ( Knight Decl, 23;)

71. Lt. Avery walked away from the non-contact booth, and

close when
29

The door is seen visibly moving. (Dingman Decl. Ex 4 @ 18:08:55 – 18:09:10)

72  At this point, Lt. Avery, officers Taylor and Williams, and deputy Rivera all came to the non-contact booth that Knight is in and asked Knight if he is going to comply with being moved to unit 4A? (Knight Decl, 24; Nikolay Decl; 4, Ex 1, Knight Dep Tr. 50:5-18, Ex 1 pg 126)

73  Knight was unresponsive to officers and stood silently with his back against the side wall rubbing his hands together in a circular motion. (Knight Decl, 25; Nikolay Decl, 4, Ex1. Knight Dep. Tr. 50:19-23; Dingman Decl, Ex 3 at 18:12:00 – 18:12:57)

74  Officer Williams was equipped with a body worn camera which was activated and recording the May 31, 2023 incident, capturing audio and visual recordings of the encounter with Knight. (Dingman Decl Ex 3)

75  Knight never stated "If Im going on adseg I might as well make it for a reason". (Knight Decl, 26; Dingman Decl, Ex 3 at 18:11:00 – 18:13:02; Nikolay Decl 4, Ex 1 Knight Dep Tr. 51:3-21)

76. At this point, Deputy Rivera opened the non contact booth and officer Taylor begin asking Knight to cuff up (Knight Decl, 27; Dingman Decl, Ex 3 at 18:11:00 – 18:13:02

77. Knight stood silently rubbing his hands together, was unresponsive, and never stated "If I'm going on adseg I might as well get this party started." (Knight Decl 25-27; Dingman Decl. Ex 3. 18:11:00 – 18:13:02)

78. At this point, Lt Avery radioed for additional staff despite the fact that Knight had not made any threatening statements or movements. (Knight Decl, 28; Avery Decl, 18; Dingman Decl, Ex 3 at 18:12:05 – 18:12:40

79. officer Dutch responded to the additional staff call arrived to assist. (Knight Decl 29; Dingman Decl Ex 4 at 18:12:05 – 18:12:25

80. At this point officer Williams and Lt Avery both removed their taser, officer Williams pointed his taser at Knight and stated in a threatening manner "If you do anything other than cuff up I'm going to tase you. (Knight Decl, 30-31; Dingman Decl. Ex 3 at 18:12:05 – 18:13:10; Nikolay Decl, 4 & 1 Knight Dep Tr. 52:8-19)

81. Officer Taylor handcuffed one of Knights hands, and with the assistance of officer Dortch, They guided Knight out of the non-contact booth and secured both of Knights hands and both officer Taylor and Dortch both maintained a secure grip on Knights wrist and forearm area. (Knight Decl., 33-36, Ex 1 pg 1-3, Ex 2 pg 5-7; Dingman Decl., Ex 3 at 18:13:00-18:13:56, Ex 4 at 18:17:10 - 18:13:42, Ex 2. pg 14,17,19,24; Nikolay Decl., 4, Ex 1 Knight Dep Tr. 58:4-24

82. At this point, with both of Knight's hands secured officer Taylor and U. Avery both holstered their tasers objectively indicating that Knight wasnt resisting, being non-compliant, threatening, or otherwise. (Knight Decl., 37, Ex 1 pg 2-4; Dingman Decl., Ex 4 at 18:13:39 - 18:13:45

83. At this point officer Williams approach Knight from behind, while officers Dortch and Taylor maintained a secure grip on my hands and arms, and officer Williams reached around Knight's body grabbed the ripp belt and pulled back on the ripp belt, which in turn caused officers Dortch and Taylor to pull my hands back towards them (Knight Decl. 38-39, Ex 1 pg 3-5, Ex 2 pg 6-7; Dingman Decl, Ex 3 at 18:13:45 - 18:13:52; Nikolay Decl., 4, Ex1, Knight Dep Tr. 65:3 - 66:9, 70:3 - 71:22)

84. At This point, very suddenly officer Williams let go of the belt, both now reached Knights head by a breaking his arms

around Knight's Forehead and chin, stepped back, twisted my head as if he was trying to break my neck and violently yanked me backwards down to the ground in a awkward and dangerous position. (Knight Decl, 40, Ex 1 pg 5-8; Dingman Decl., Ex 4 at 18:13:51 - 18:13:54; Nikolay Decl 4, Ex 1 Knight Dep. Tr. 71:17 - 72:23.

85. The sudden attack by Officer Williams was very shocking, and terrifying because Knight thought Williams was trying to break his neck or cause his head to crack open, thus Knight did have an adverse reaction (Knight Decl. 41)

86. Once Knight was violently thrown down to the ground seven officers, including Lt. Avery officers Taylor, Williams, Dortch, Saavedra, Dangerfield, and Deputy Rivera all responded immediately and subdued and pinned Knight down to the ground from head to feet. (Knight Decl, 42 Ex 1 pg 7-11; Dingman Decl., Ex 4 at 18:13:52 - 18:14:10; Nikolay Decl., Lt. Ex1 Knight Dep Tr. 83:1-10.

87. Despite being pinned down, subdued and handcuffed, Lt. Avery attempted a pressure point and I felt a hand in my face area and Avery painfully repeatedly struck Knight in the Stomach. (Knight Decl, 44, Ex 1 pg 9-11; Dingman Decl Ex 4 at 18:13:53 - 18:14:10; Avery

88. Both of Knights hands were secured in handcuffs when he was thrown down by Williams and Knight never not once reached for nor grabbed any officers shirt collar, including but not limited to officer Williams. (Knight Decl, 43; Ex 1 pg 7-14; Dingman Decl, Ex 4 at 18:13:52-18:14:10; Nikolay Decl, 4, Ex1 Knight Dep TR. 85: 7-19

89. Despite being pinned down by Seven officers, including Taylor himself from head to feet and not resisting the officers Taylor raised up pulled out his taser Yelled move, Taser, Taser, Taser and all the officers immediately cleared away from Knight and Taylor shot Knight with his Taser striking Knight in the left buttock and lower left back. (Knight Decl. 45, Ex 1 pg 11-15; Dingman Decl Ex 4 at 18:14:10 - 18:14:16, Ex 3 at 18:14:15 -18:14:22; Nikolay Decl 4, Ex1 Knight Dep Tr. 1-25)

90. After being tased Knight asked officer Taylor "Why did you tase me?" to which he replied in slang "G, you trippin". (Knight Decl, 46; Nikolay Decl 4, Ex1, Knight Dep Tr. 88:21-24, 90:1-4)(Dingman Decl. Ex 3 at 18:14:10 - 18:16:56)

91. Knight then asked officer Williams "Why did he Just grab me by my head and throw me to the ground", to which he replied "you were tipping away, pulling away, refusing to be secured" (Knight Decl. 47; Dingman Decl Ex 3

Case 2:23-cv-00886-NJ  Filed 12/23/24  Page 35 of 36  Document 55

34

18:14:10 - 18:16:56; Nikolay Decl 4 Ex 1 Knight Dep Tr. 90:6-21)

92. Eventually the nurse responded to the 6th floor and she forcefully and painfully removed the metal prongs by yanking them from my body with her hands. (Knight Decl 48; Dingman Decl Ex 3 at 18:14:50 - 18:19:32; Nikolay Decl 4, Ex 1, Knight Dep Tr. 91:12-17

93. The nurse did not properly clean the taser entry wounds That I recall and Knight did not deny any medical treatment (Knight Decl. 49; Dingman Decl Ex 3 at 13:14:50 - 18:19:32; Nikolay Decl, 4 Ex 1 Knight Dep Tr. 91:16-92:9 )

Dated at Green Bay, Wisconsin
December 13, 2024

Respectfully Submitted

Keenan I Knight