UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**KEENAN T. KNIGHT,**

        **Plaintiff,**

v.                                                                                                 Case No. 23-CV-886

**AMIKA AVERY,** *et al.*,

        **Defendants.**

---

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Keenan T. Knight, who is incarcerated and representing himself, brings this lawsuit under 42 U.S.C. § 1983. Knight was allowed to proceed on claims of excessive force against defendants Jordan Taylor and Terrell Williams. He was also allowed to proceed on a failure to intervene claim against defendant Amika Avery. Additionally, the Court took supplemental jurisdiction of his state law claim.

The defendants move for summary judgment in their favor as to all of Knight's claims. (Docket # 31.) The parties have consented to magistrate judge jurisdiction. (Docket # 6, Docket # 10.) For the reasons stated below, the defendants' motion for summary judgment is granted in part and denied in part.

**PRELIMINARY MATTERS**

In their reply, the defendants argue that Knight failed to follow Federal Rule of Civil Procedure 56 and Civil Local Rule 56 when responding to their motion for summary judgment because his responses to the defendants' proposed findings of fact "generally do not make specific reference to parts of the record that would support his disputes." (Docket

# 50 at 3.) District courts are entitled to construe *pro se* submissions leniently and may overlook a plaintiff's noncompliance by construing the limited evidence in a light most favorable to the plaintiff. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). While Knight's citations to the record are sometimes incomplete, I have Knight's declaration to rely on, as well as two videos that capture the relevant incident. As such, I will consider the information contained in Knight's submissions where appropriate in deciding the defendants' motion.

The defendants also argue in their reply that I should disregard Knight's assertion in his response to their motion for summary judgment that Williams had no reason to decentralize Knight. (Docket # 50 at 3–4.) Specifically, they assert that Knight "acknowledged at his deposition that Officer Williams reasonably believed that Knight was physically resisting being physically strained" contrary to what he asserts in his declaration in response to their motion for summary judgment, making his declaration a "sham affidavit." However, the citation to the deposition transcript given by the defendants does not clearly support this contention—instead it supports the assertion that Knight began resisting *after* he was decentralized. (Docket # 41-1 at 77:14–21.) I was unable to locate another portion of the deposition where Knight clearly agrees that Williams acted reasonably when taking him down, and in fact, at several points in the deposition, Knight maintains that he was calm and not resisting prior to Williams' takedown. (*See, e.g.*, *id.* at 73:18–24.) As such, I do not consider Knight's declaration a "sham affidavit" and will consider his declaration where appropriate in deciding the defendants' motion.

## FACTS

On May 31, 2023, while Knight was a pretrial detainee in the Milwaukee County Jail, Jail staff discovered smoke in Knight's housing unit. (Docket # 55, ¶ 7.) Staff moved Knight to a "non-contact" booth so his cell could be searched. (*Id.*, ¶ 8.) The defendants assert that Knight "initially refused to go into the non-contact booth, but eventually complied with Lt. Avery's order." (*Id.*, ¶ 9.) Knight disputes this, saying that non-defendant Officer Saavidia told him he had a lawyer visit in the non-contact booth, and when Knight got there and saw his attorney was not present, he said he wanted to go back to his cell. (*Id.*) At that point, Avery arrived and informed Knight that he was being placed in the non-contact booth so they could search his cell, and Knight said he immediately complied when Avery asked him to go into the non-contact booth. (*Id.*) After staff searched Knight's cell, they found cigarettes and tobacco, which are contraband. (*Id.*, ¶ 10.)

Once the contraband was discovered, Avery ordered Knight to be moved to housing unit 4A to await discipline. (Docket # 55, ¶ 11.) Avery then approached the non-contact booth and informed Knight he was being moved to administrative segregation pending a due process hearing for possessing contraband. (*Id.*, ¶ 13.) The defendants assert that once Knight was told he was being placed on administrative segregation, he responded "Well, I ain't complying then—we might as well get the party started." (*Id.*, ¶ 14.) Knight denies saying this but states that he repeatedly demanded to speak with non-defendant Captain Hannah because he disagreed with the decision to place him in administrative segregation. (*Id.*, ¶¶ 14–15.)

The defendants assert that Avery ordered Knight to comply with the order to be placed in a "RIPP" restraint belt in order to be moved to administrative segregation, and

3

Knight refused. (Docket # 55, ¶ 16.) Knight states that he "was not failing to comply with any order but simply silently taking time to get his mental and emotional state together to be placed on adseg." (*Id.*) According to the defendants, several more officers arrived at the non-contact booth, including defendants Taylor and Williams, in an effort to get Knight to comply with Avery's order. (*Id.*, ¶¶ 16–17.) The defendants assert that Knight stated, "If I'm going on adseg, I might as well make it for a reason." (*Id.*, ¶ 19.) At this point, Williams unholstered his taser and told Knight if he did not comply with Avery's order, he would use force. (*Id.*) Knight denies stating that if he was going to go on administrative segregation, he might as well make it for a reason. (*Id.*) He also maintains that he was not resisting orders to be placed in handcuffs but was remaining silent, "rubbing his hands together in circular motions." (*Id.*) The defendants assert that Knight was not rubbing his hands together but was "repeatedly cracking his knuckles and making a fist." (*Id.*, ¶ 20.)

Williams then told Knight that if he "did anything besides put his hands outside of the cell to be cuffed, he would be tased." (Docket # 55, ¶ 21.) It is undisputed that Knight responded, "you want to blow that motherfucker, you wanna blow it." (*Id.*) Knight notes that when he made this statement, he was already in the process of being cuffed. (*Id.*) Taylor began securing Knight into the RIPP belt, and Avery radioed for additional staff to assist in moving Knight. (*Id.*, ¶¶ 23–24.) The defendants assert that one of the responding officers, non-defendant Officer Dortch, tried to gain Knight's compliance and failed. (*Id.*, ¶ 26.) Knight states that Dortch, along with Taylor, took him out of the non-contact booth and "successfully secured both of Knight's wrists in handcuffs without incident of any kind because Knight was not being resistive." (*Id.*) At that point, according to Knight, Dortch and Taylor had a secure grip of both Knight's wrists and forearms. (*Id.*, ¶ 27.) The

defendants claim that during this process, Knight "was agitated, tense, and focused on Williams, whose taser remained drawn and aimed" at Knight. (*Id.*, ¶ 28.) Knight disputes this and notes that he is seen to be smiling during the process. (*Id.*)

The defendants state that while Taylor successfully secured Knight's wrist into the handcuff portion of the RIPP belt, Dortch was not successful, and Knight was "clasping his hands together to prevent his other wrist from being secured." (Docket # 55, ¶ 29.) Knight reiterates that Dortch and Taylor, by this time, had successfully secured his wrists and forearms. (*Id.*) The defendants state that Taylor then "attempted to secure Mr. Knight's other hand in the handcuff portion of the RIPP restraint belt but was unable due to him tensing up and moving." (*Id.*, ¶ 30.) Knight disputes this and states that he was successfully secured in the handcuff portion of the RIPP belt. (*Id.*)

At this point, Williams holstered his taser and moved behind Knight to place the RIPP Velcro belt around Knight's waist, but Knight "continued to resist, preventing Officer Williams from being able to secure Knight." (Docket # 55, ¶ 31.) Knight notes that Williams, by holstering his taser, did not perceive Knight as a threat and is evidence that Knight was not resisting. (*Id.*) He also states that when Williams attempted to pull the Velcro belt, he was not resisting, and when Dortch and Taylor pulled Knight's hands back towards them in response to Williams pulling the belt, that is when Williams "immediately let go of the belt and forcefully and very aggressively wrapped his arms around Knight's forehead and chin area, stepped back, and violently yanked Knight to the ground in a very awkward and dangerous manner." (*Id.*, ¶ 31.) The defendants assert that because Knight was not fully restrained in the RIPP belt, and given Knight's large size and stature, he posed a "significant security risk" such as allowing Knight to use the belt "as a weapon to hit or

5

choke officers and/or other occupants." (*Id.*, ¶¶ 32–33.) The defendants also assert that as Williams was attempting to secure the Velcro belt, both Avery and Williams noticed "Knight tense up and ball his fist up, which signified to Officer Taylor that Knight was getting into a pre-attack posture and attempted assault was imminent." (*Id.*, ¶ 34.) Defendants assert that this is why Williams deployed the destabilizing technique. (*Id.*, ¶ 35.)

Once Knight was on the ground, several other officers, including Avery and Taylor, moved to further stabilize Knight. (Docket # 55, ¶ 36.) The defendants state that Knight had grabbed hold of Williams' shirt collar. (*Id.*) Knight states that his hands remained cuffed, and he could not grab Williams' shirt collar. (*Id.*) He also states that at least seven officers had him pinned to the ground, and he was not resisting. (*Id.*) The defendants state that Knight refused several directives to let go of his shirt collar, while Knight maintains that he was "subdued and pinned down to the ground." (*Id.*, ¶ 37.) At one point, Avery "attempted to apply a pressure point to Knight's right ear to force him to release Officer Williams' shirt collar, but it was not successful." (*Id.*, ¶ 38.) Knight does not dispute that Avery's "hand was digging into his eyes and facial area," but he maintains that he did not have a hold on Williams' shirt collar and was successfully subdued and pinned down. (*Id.*) It is also undisputed that Avery "delivered two strong side arm focus strikes to Knight's abdomen, but they were unsuccessful." (*Id.*, ¶ 39.)

The defendants assert that Taylor, noting that Knight was not secured in the RIPP belt, unholstered his taser, shouted "Move, Taser, Taser, Taser" and then deployed his taser. (Docket # 55, ¶ 41.) Knight states that he was not resisting when Taylor deployed his taser. (*Id.*) The taser hit Knight in the buttocks and lower back. (*Id.*, ¶ 42.) Knight was then

6

fully secured into the RIPP belt. (*Id.*, ¶ 45.) Medical staff came to remove the taser prong from Knight's body. (*Id.*, ¶ 46.)

The defendants assert that Knight continued to be resistive after being tasered, arguing with staff. (Docket # 55, ¶ 47.) Knight admits to asking why he was tased. (*Id.*) He also admits that Williams responded that it was because Knight was pulling away and was refusing to be secured. (*Id.*) After this interaction, Knight was taken to administrative segregation without further incident. (*Id.*, ¶ 48.) The defendants assert that Knight's injury was *de minimus*, as he only had slight wounds at the entry point of the taser. (*Id.*, ¶¶ 50–53.) Knight states that the wounds caused by the taser were painful; he was bleeding and he experienced pain well into the night. (*Id.*)

The defendants also submitted two videos of the incident—Williams' body camera video and a surveillance camera video without audio. (Docket # 34-3; Docket # 34-4.) Neither video completely corroborates either party's version of the events. The body camera video shows that Knight was repeatedly asked if he is going to comply with the order to be secured prior to being moved. Knight does not respond to the officer's direct question. Knight is not cracking his knuckles or balling his hands into fists, but instead he is rubbing his hands together. Knight appears calm and is smiling through most of the encounter. (Docket # 34-3 at 0:30–2:57.) The video does not capture Knight saying anything to the effect of "If I'm going on adseg, I might as well make it for a reason," right before Williams unholsters his taser. Once Williams unholsters his taser, the view of the camera is blocked by Williams' arms. Knight appears calm, telling Williams that using a taser would be "asking for a lawsuit," but again he does not sound agitated or upset. (*Id.* 2:58–4:00.) Williams then holsters the taser and approaches Knight from behind. Once Williams moves

7

to take down Knight, the camera is completely obscured. Someone is saying "let me go" repeatedly, but it is impossible to tell who. The taser is then deployed, and Knight howls. Once Knight calms down, he asks why he was tased, to which someone responds (presumably Williams), "you kept ripping away, pulling away." (*Id.* 4:01–5:15.)

The surveillance video fills in many of the gaps from the body camera video, but there is no audio. It shows Avery and Knight talking for several minutes, and Knight appears relatively calm. (Docket # 34-4 at 22:00–27:30.) Williams then approaches, and he turns his body camera video on. (*Id.* 27:31–27:40.) While the officers are talking with Knight, he does not appear to be agitated, but he also appears to not be following directives. When the door opens to handcuff Knight, Knight is seen smiling and calmly talking to the officers. As he exits the cell, Knight inches away from the two officers attempting to cuff him into the RIPP belt, but he is not actively or aggressively resisting. (*Id.* 27:41–30:06.) Williams holsters his taser and approaches Knight from behind to fasten the Velcro belt. Knight does not appear to be struggling or ripping away, but the two officers who have his wrists seem to slightly pull him forward. As soon as that happens, Williams takes Knight down. (*Id.* 30:06–30:48.) Once Knight is on the ground, he starts twisting and turning, and several officers move to stabilize him. From the video, it is impossible to tell if Knight has a hold of Williams' shirt. (*Id.* 30:49–31:09.) Taylor then draws and deploys his taser. (*Id.* at 31:10.) Once tased, Knight starts to calm down and is eventually secured without incident. (*Id.* 31:11–38:00.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

8

Case 2:23-cv-00886-NJ    Filed 03/20/25    Page 8 of 16    Document 59

law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Knight claims that Williams violated his Fourteenth Amendment rights when he used the destabilizing maneuver on him and that Taylor violated his Fourteenth Amendment rights when he tased him. He also claims that Avery failed to intervene to prevent the use of excessive force.

### 1. Applicable Law on Excessive Force

Because Knight was a pretrial detainee, his claims of excessive force are governed by the Due Process Clause of the Fourteenth Amendment. The "Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *See Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015) (citing *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). Whether a defendant used excessive force is an objective, rather than a subjective, determination, and "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* Whether the force was objectively unreasonable turns on the "facts and circumstances of each particular case." *Id.* at 397. "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* In assessing the officer's use of force, "a court must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal quotations marks and citations omitted). Other considerations to determine whether the force is reasonable include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*

### 1.1 Excessive Force Claim against Williams

Even considering the video evidence, there are questions of material fact as to whether Williams' use of the destabilizing tactic was excessive and unreasonable. The defendants state that Knight was agitated and tense while the RIPP belt was being secured, but the video does not capture this. While the video shows that Knight was not responding to the directives, the video does not demonstrate that he was behaving aggressively or actively preventing the officers from securing him. He appears calm, and at points is smiling. Further, the video does not show Knight balling his fists or cracking his knuckles, as the defendants contend. Instead, the video shows Knight rubbing his hands together. Significantly, the video does not capture the defendants' assertion that just prior to Williams taking him down, Knight "was getting into a pre-attack posture and attempted assault was imminent." (Docket # 55, ¶ 34.) Nor does it capture that Knight was purposely pulling away from Williams when Williams was attempting to secure the Velcro belt. While the video does show that Knight was slightly pulled away from Williams, it is impossible to tell if that is because Taylor and Dortch pulled Knight (as Knight contends) or because Knight was actively resisting (as the defendants contend).

Additionally, the defendants argue that Knight was noncompliant and given his history of violently refusing to obey orders coupled with his size, he was an imminent security threat. However, this is insufficient to establish as a matter of law that the amount of force was appropriate absent concrete evidence that Knight was a threat.

At bottom, the defendants argue that Knight was taken to the ground because he physically resisted being fully restrained. Knight disputes this, and the video does not

11

conclusively resolve the dispute. Accordingly, summary judgment as to the claim against Williams is not appropriate.

### 1.2 Excessive Force Claim Against Taylor

Similarly, questions of material fact remain, even with the video evidence, as to whether Taylor's use of the taser was reasonable. The video shows, and Knight does not dispute, that once Knight was brought to the ground, he started to twist and physically resist. However, there were several officers working to subdue him. The video also does not show whether Knight was actually holding on to Williams' shirt. While someone is heard saying "let go"; this statement alone is not conclusive. Knight denies that he held Williams' shirt and states that he was secured and fully pinned to the ground. The defendants state that Knight would not let go of Williams' shirt and was an active threat necessitating a taser. This is a question of material fact best settled by a jury.

The defendants also argue that because Knight did not suffer a significant injury, the force was not unreasonable. However, "[t]he absence of significant injury will not defeat a claim of excessive force." *Williams v. Stauche*, 709 Fed. App'x 830, 834–35 (7th Cir. 2017). Because a reasonable factfinder could conclude that the use of the taser was unreasonable, summary judgment is denied as to Taylor.

### 2. *Failure to Intervene Claim Against Avery*

"An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had a reason to know . . . that excessive force was being used . . . *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994) (emphasis in original). "[A] realistic opportunity to intervene may

12

Case 2:23-cv-00886-NJ    Filed 03/20/25    Page 12 of 16    Document 59

exist whenever an officer could have called for backup, called for help, or at least cautioned [the officers using excessive force] to stop." *Abdullahi v. City of Madison*, 424 F.3d 763, 774 (7th Cir. 2005). This inquiry almost always implicates questions of fact for a jury. *Id.* "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for a trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise. *Lanigan v. Vill. Of E. Hazel Crest Ill.,* 110 F.3d 467, 478 (7th Cir. 1997).

The video is also not dispositive of this claim. Assuming Knight's constitutional rights were violated, the video shows that there was ample opportunity for Avery to tell Williams to stop or to tell Taylor not to deploy the taser. It unclear whether Avery did so. Moreover, because there are questions of material fact for a jury to resolve regarding whether Williams and Taylor committed excessive force, there are also questions of material fact as to whether Avery failed to intervene. As such, summary judgment on the failure to intervene claim is denied.

   3.   *State Law Claim*

Knight also brings a state law tort claim of intentional infliction of emotional distress. The defendants argue that this claim should be dismissed because Knight did not, pursuant to Wis. Stat. § 893.80(1d), present the Milwaukee County Clerk's office with a notice of claim within 120 days of the occurrence of the event. The defendants assert that because Knight did not do this, the statute requires that his state law claim be barred.

Knight does not dispute that he did not provide notice to the Milwaukee County Clerk's office pursuant to § 893.80(1d). Instead, he argues that the defendants waived their right to assert a Wis. Stat. § 893.80(1d) defense because the deadline to file summary

13

judgment on the grounds that Knight failed to exhaust his administrative remedies has passed. (Docket # 55, ¶ 54.)

Under Wisconsin law, waiver is defined as "'a voluntary and intentional relinquishment of a known right.'" *Jones v. York*, 2023 WI App 44, ¶ 14, 995 N.W.2d 496 (quoting *Batchelor v. Batchelor*, 213 Wis. 2d 251, 256, 570 N.W.2d 568 (Ct. App. 1997)). Although a party need not intend to waive, the waiving party must act intentionally and with knowledge, actual or constructive, of the material facts. *Id.* While waiver is ordinarily a question of fact, in the absence of disputed material facts, waiver may be decided as a matter of law based on the conduct of the parties. *Id.* The party asserting waiver has the burden of demonstrating that the defendants' intent to waive can be inferred as a matter of law from the undisputed facts. *Id.*

Knight has failed to demonstrate the defendants intended to waive their Wis. Stat. § 893.80(1d) defense by raising the argument at this stage of the proceedings. The deadline in the scheduling order for exhaustion of administrative remedies pertains to the exhaustion requirement found in the PLRA, 42 U.S.C. § 1997e(a), which address exhaustion of administrative remedies for claims brought under § 1983 or any other Federal law. The deadline does not encompass Wisconsin's notice-of-claim statute.

Furthermore, federal courts are encouraged to relinquish supplemental jurisdiction over a party's state law claims if all federal claims have been dismissed. *Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 607 (7th Cir. 2008). For this reason, it makes sense for defendants to raise issues regarding supplemental state law claims at the summary judgment stage on the merits of the federal claims. In other words, if Knight's federal claims were dismissed on the merits, his state law claim would also have been

14

dismissed without prejudice for lack of jurisdiction. But because Knight's federal claims remain and thus supplemental jurisdiction continues over Knight's state law claim, it is proper to address the parties' arguments regarding Knight's state law claim at this time. And I find Knight has not demonstrated that the defendants waived their Wis. Stat. § 893.80(1d) defense by waiting until summary judgment on the merits to raise it. Thus, Knight's state law claim is dismissed.

    4.    *Qualified Immunity*

The defendants argue that even if there are questions of material fact, they are nevertheless entitled to summary judgment in their favor because of qualified immunity. To determine whether qualified immunity applies, the court must consider: "(1) whether the defendants violated a constitutional right, and (2) whether the constitutional right was clearly established." *Broadfield v. McGrath*, 737 F. App'x 773, 775 (7th Cir. 2018). I have found that the defendants may have violated Knight's constitutional rights. The only questions remaining are whether, operating under the law as it existed in May 2023, a reasonable officer would have known that using force to the extent that they did would amount to a constitutional violation and whether a reasonable officer would know that failing to intervene to prevent that use of force was a constitutional violation.

It is well-established that officers cannot use force that is severe enough that it amounts to punishment and doing so amounts to a constitutional violation. *See Kingsley* 576 U.S. at 396–97 (citing *Graham,* 490 U.S. at 395 n.10) ("Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."); *Williams* 709 Fed. App'x at 834-35; *Broadfield*, 737 F. App'x at 776 (holding that it is well-established that if the use of force was objectively unreasonable, it violates the Constitution, and

15

Case 2:23-cv-00886-NJ   Filed 03/20/25   Page 15 of 16   Document 59

qualified immunity does not apply). It is also well-established that failing to intervene to prevent the use of excessive force amounts to a constitutional violation. *See Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009); *Lemons v. Larson*, No. 16-CV-371, 2018 WL 4374930, at *6 (E.D. Wis. Sept 13, 2018). Thus, the defendants are not entitled to qualified immunity at this juncture.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted in part and denied in part. Knight's state law claim is dismissed for failure to file the appropriate notice under Wisconsin law. However, the excessive force claims and the failure to intervene claim remain. A status conference will be set to address further scheduling in this case.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (Docket # 31) is **GRANTED IN PART AND DENIED IN PART**. The state law tort claim is **DISMISSED**. All other claims remain.

Dated at Milwaukee, Wisconsin this 20th day of March, 2025.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge